TSHAMBI SEKOU *v.* WARDEN, STATE PRISON
(14061)

PETERS, C. J., CALLAHAN, GLASS, COVELLO and HULL, Js.

Argued October 4—decision released December 25, 1990

*Stephen M. Carney* and *Mary Chromik,* certified legal interns, and *Timothy H. Everett,* with whom, on the brief, were *Todd D. Fernow* and *Michael R. Sheldon,* for the appellant (petitioner).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, for the appellee (respondent).

GLASS, J. The petitioner, Tshambi Sekou, also known as Anthony Saia, has appealed from the dismissal of his petition for a writ of habeas corpus, in which he sought to vacate the judgment of the Superior Court convicting him of arson in the first degree in violation of General Statutes § 53a-111.[1] Before the habeas court, Sekou alleged that: (1) the judgment of conviction was procured in violation of his federal and state constitutional rights to counsel of his choice; and (2) his appellate counsel rendered ineffective assistance in neglecting to raise certain constitutional issues for our review in his direct appeal,[2] namely, that the trial court deprived him of his federal and state constitutional rights to a fair trial, and his federal constitutional right to be present at his trial.[3] The habeas court rejected each of Sekou's claims, and dismissed his petition. We agree with the habeas court that Sekou's conviction was not procured in violation of his constitutional rights, and that his appellate counsel did not render ineffec-

---

[1] "[General Statutes (Rev. to 1972)] Sec. 53a-111. ARSON IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, he starts a fire or causes an explosion, and (1) at the time, another person is present in such building or is so close to such building as to be in substantially the same danger as a person in such building would be, and (2) the actor is either aware that a person is present in or close to such building, or his conduct manifests an indifference as to whether a person is present in or close to such building. . . ."

[2] Our decision affirming Sekou's conviction is reported in State v. Saia, 167 Conn. 286, 355 A.2d 88 (1974).

[3] The habeas court found that Sekou's failure to raise the first of these claims in his direct appeal did not amount to a deliberate bypass of appellate procedure because the claim was based upon material facts not fully contained in the record of his trial. This finding is not disputed. As for the claims that he was denied a fair trial and the right to be present at his trial, Sekou maintained that they were not raised in his direct appeal because of the ineffective assistance of his appellate counsel. We have held "that any claim invoking ineffective assistance of appellate counsel automatically satisfies the deliberate bypass requirement." Valeriano v. Bronson, 209 Conn. 75, 85, 546 A.2d 1380 (1988).

tive assistance. Accordingly, we affirm the decision of the habeas court dismissing his petition for a writ of habeas corpus.

Our review of the habeas court's decision requires that we consider certain events that took place at Sekou's first trial upon the arson charge in January, 1972, in order to illuminate the significance of those that occurred at his second trial upon the same charge in June, 1972, during which his constitutional rights were allegedly violated. After his arrest in October, 1971, Sekou applied for appointed counsel, and attorney Richard Scalo from the office of the public defender was appointed to represent him at the January trial. Michael Mahigel, a friend of Sekou's, subsequently offered to pay private attorney Charles Hanken to defend Sekou at the January trial. Hanken apparently agreed to defend Sekou, but declined to do so after the court denied his request for a continuance.

On the first day of the January trial, Scalo filed a motion requesting that Sekou undergo a mental competency examination. Sekou argued before the court in support of the motion. On the basis of his apparent intelligence and "model" behavior in the courtroom, the court determined that he could understand the proceedings and assist in his defense and denied the motion. On the following day, Sekou was injured when his hands and/or his head went through a window at the courthouse. The court then declared the January trial a mistrial, and ordered Sekou to submit to a competency examination.

Thereafter, a psychiatrist reported that Sekou's behavior "when taken to court recently and more recent behavior at Somers [prison] indicates that he is making a conscious and planned attempt to avoid prosecution. . . . Past and present behavior indicate that

this man will go to any extreme to gratify immediate desires. He should be considered extremely dangerous." In light of the psychiatric report, the court found Sekou competent to stand trial. On May 2, 1972, this court dismissed Sekou's appeal from that finding. *State v. Saia*, 163 Conn. 621, 290 A.2d 357 (1972).

Sometime during the last week of April or at the beginning of May, 1972, Scalo notified Sekou, who at that time had been incarcerated in Somers prison, that his retrial would commence on June 6, 1972. Sekou mailed letters to Hanken and private attorney Leo Flaherty in mid-May, requesting their assistance at the upcoming June trial. Sekou received a response from Flaherty, who declined the request. He never heard from Hanken. At the habeas hearing, Mahigel testified that he had been unaware that Sekou had been retried in June, 1972, but that if he had known of it, he would have provided Sekou with the funds necessary to hire private counsel.

As a result of a riot at Somers prison, the prison was generally closed to outside visitors and inmates' telephone privileges were curtailed from May 23 to May 30, and from June 1 to June 4, 1972. Mail privileges also may have been restricted during that period. On June 1, 1972, Sekou obtained an order from a judge presiding over an unrelated proceeding at the prison that he be allowed to consult with Hanken when he arrived at court for the June trial. Upon his arrival, however, Sekou discovered that Hanken was not present in the courthouse.[4] He also learned that Scalo had departed from the public defender's office for private practice, and that attorneys James Diorio and Dominick Galluzzo, both assistant public defenders, had been assigned to represent him in Scalo's place.

---

[4] For reasons unknown, Hanken did not appear at the courthouse at any time during the June trial.

Diorio testified at the habeas hearing that he had been able to discuss the case with Sekou while the court considered preliminary matters for one and one-half days before jury selection for the June trial. On the day that jury selection had been scheduled to commence, however, and after the court had waited approximately forty-five minutes for Sekou to appear in the courtroom, Diorio informed the court that Sekou had refused to participate in the proceeding until represented by "competent" counsel of his own choice. Diorio also told the court that Sekou had stated that he had mailed letters to three private attorneys during the previous month but the letters had been returned due to the prison closure, and that Hanken had been denied permission to visit him at the prison during the previous week.

The court noted that Diorio was competent and that the public defender's office had represented Sekou for at least two years. Further, recollecting that Sekou's actions had so frustrated the January trial that it had been declared a mistrial, the court found that Sekou's "tactics" of demanding counsel from a distant part of the state and deliberately refusing to appear in the courtroom were a mere "ruse" to achieve the delay of his trial. The court then stated that Diorio could contact private counsel on behalf of Sekou. In fact, Diorio telephoned private attorney Robert Pigeon, but Pigeon opted not to defend Sekou.

Also with respect to Sekou's refusal to appear in the courtroom for jury selection, the court found that in light of "the prior history of [Sekou's] activities in and out of the courtroom," it was "in his best interests that he not be shackled and straitjacketed and placed in front of the jury to secure his presence in the courtroom during his trial. This court has offered [Sekou] the alternatives of either attending the trial dressed

normally or hearing and seeing the trial through whatever equipment the court is able to provide down in his cell." Sekou voluntarily elected to remain in his cell, and the court decided to proceed with jury selection after installing a closed circuit television and loudspeaker system outside of his cell.

During jury selection, Sekou began shouting in his cell in a manner audible in the courtroom: "Judge Mulvey [is] a bigoted, racist pig." The court ordered a recess, and directed Diorio to warn Sekou that he would be restrained if he continued to disturb the proceedings. Diorio relayed the warning to Sekou, and upon returning to the courtroom, reported that Sekou had responded that Diorio and Galluzzo did not represent him and were prejudiced against him. Shortly thereafter, a sheriff alerted the court that Sekou had irreparably damaged the television monitor by knocking it over when returning from the men's room while accompanied by four guards. The sheriff also reported that Sekou had been "going on a rampage" in his cell, apparently breaking benches therein, and the sheriff suggested that restraints were necessary. After consulting with the sheriff, the court ordered him to restrain Sekou in a straitjacket. The court then obtained an operable audio-visual system so that Sekou could continue to observe the proceedings.

On the second day of the June trial, Galluzzo informed the court that Sekou had indicated that he was willing to participate in the proceedings, but he desired to appear in the courtroom attired in civilian clothing. Galluzzo also stated that Sekou wished to renew his request for private counsel before the court personally, and that even if the court denied the request, Sekou had indicated that he would cooperate with Galluzzo and Diorio and actively assist in his defense. Taking note of Sekou's "past history of . . . deliberate actions," and

finding that Sekou's "actions of yesterday indicate, clearly that he is a person who is prone to violence," the court ordered that, "for the safety of this court, its personnel, members of the jury" and "any person connected with this trial," Sekou could attend the trial only if restrained. The court also found Sekou's request for counsel a meritless "maneuver" to achieve delay and, reiterating that Sekou had been afforded competent counsel, denied the request.

The court then stated that because Sekou had expressed a willingness to cooperate with Diorio and Galluzzo, they would be afforded "any time they need to confer with their client." Thereafter, numerous recesses were ordered to permit defense counsel to consult with Sekou, and Sekou also communicated with counsel through notes sent from his cell. Sekou testified at the habeas hearing that he "started communicating more with Attorney Diorio, and . . . Galluzzo [and] every five minutes somebody was running down" to his cell to speak with him.

When a witness was taken to his cell to identify him, Sekou declared that he wished "to appear in the courtroom in an orderly and peaceful manner to put on the best defense available . . . ." Diorio later read a note from Sekou into the record, in which Sekou had again requested to be present in an orderly manner in the courtroom. Because of Sekou's "disgraceful performance of yesterday," the court stated that "this court cannot rely on him conducting himself in an orderly manner." The court then repeated that it was unwilling to jeopardize the safety of the court personnel and the jury, and, therefore, Sekou could be present in the courtroom only if restrained.

On the following day, Diorio announced his intention to call Sekou as a witness. The court responded that

Sekou could appear as a witness provided that he was restrained with a straitjacket and leg irons, and a sheriff was stationed beside him. Further, the court stated that Sekou would be permitted to take the witness stand before the jury came into the courtroom, and the jury would be excused before Sekou was returned to his cell.

While the jury was absent from the courtroom, Sekou assumed the witness stand in a straitjacket and leg irons, and with a sheriff posted beside him. The jury was called into the courtroom after Sekou's straitjacket was covered with a sport coat. Immediately after stating his name for the record, Sekou asserted: "[M]ay it be noted for the jury's sake why I am in these restraints? . . . I feel this is very prejudicial to my defense to have me confined in this manner. . . . I just wish the jury to be informed of this, your honor."

Sekou then testified that he had been incarcerated for approximately sixteen years as a result of his convictions for the commission of several felonies. One of his convictions had resulted from his aid in an attempted escape from a penal institution, and another had arisen from his participation in a prison riot. Sekou also had been charged with the crime of assault with the intent to maim after he had attacked a prison guard with a kitchen knife, but he had been found not guilty by reason of insanity. During his testimony, Sekou requested that the sport coat which concealed his straightjacket be removed because it was "extremely hot." A sheriff promptly removed the coat. Upon completion of cross-examination, the court excused the jury, and Sekou was escorted to his cell. The court instructed the jury after the close of the evidence not to draw any inference from the fact that Sekou had been restrained while testifying.

## I

Sekou first claims that the trial court deprived him of his right to counsel of his choice as guaranteed by the sixth amendment to the United States constitution and article first, §§ 8 and 9, of the Connecticut constitution by arbitrarily denying his request for a continuance to contact private counsel. According to Sekou, because he had neither met nor consulted with Diorio or Galluzzo before trial, the court's ruling forced him to proceed to trial with counsel with whom he had "no foundation of trust or communication." He claims that his unfamiliarity and inability to communicate with his counsel, as well as his expectation that he would be permitted to contact private counsel on the first day of his trial, constituted "valid and sufficient reason" for a continuance. We disagree.

"While a criminal defendant's right to be represented by counsel ' "implies a degree of freedom to be represented by counsel of [the] defendant's choice . . ." ' ; *State* v. *Reed,* 174 Conn. 287, 292, 386 A.2d 243 (1978); this guarantee does not grant a defendant an ' "unlimited opportunity to obtain alternate counsel" ' on the eve of trial. *State* v. *Drakeford,* 202 Conn. 75, 83, 519 A.2d 1194 (1987)." *State* v. *Gonzalez,* 205 Conn. 673, 683, 535 A.2d 345 (1987). " 'In order to work a delay by a last minute [replacement] of counsel there must exist exceptional circumstances.' . . . *United States* v. *Grow,* 394 F.2d 182, 209 (4th Cir.), cert. denied, 393 U.S. 840, 89 S. Ct. 118, 21 L. Ed. 2d 111 (1968)." *State* v. *Drakeford,* supra, 83-84. "Whether the circumstances warrant the appointment of new counsel is within the discretion of the trial court. [Id., 83]; *State* v. *Watson,* 198 Conn. 598, 610, 504 A.2d 497 (1986)." *State* v. *Gonzalez,* supra. A court need not permit the replacement of counsel " 'upon a defendant's

mere whimsical demand and certainly not where it is evident that a professed disenchantment with his lawyer is a subterfuge to secure an unwarranted delay in the trial.' . . . " (Emphasis omitted.) *State* v. *Beaulieu,* 164 Conn. 620, 629, 325 A.2d 263 (1973), quoting *United States* v. *Follette,* 282 F. Sup. 993, 995 (S.D.N.Y. 1968), aff'd, 425 F.2d 257 (2d Cir. 1970).

The record in this case reveals that the court was well within its discretion in refusing to grant Sekou's request for a continuance. Although Sekou had claimed that his efforts to contact private counsel had been thwarted by the prison closure,[5] he had been aware in either the last week of April or in early May that he would be retried in June. Since the prison did not close until May 23, 1972, Sekou had approximately three to four weeks from the date he had been notified of his impending retrial in which to engage private counsel.

Long before the June trial, moreover, Sekou had attempted to obtain the services of Hanken for the January trial. Sekou similarly could have sought Hanken's assistance while his appeal from the court's competency finding was pending. There is no indication in the record that during the pendency of his appeal Sekou attempted to contact Hanken, or for that matter, any other attorney. The record similarly fails to disclose that Sekou contacted Mahigel, his financial source for counsel for the January trial, at any time other than prior to the January trial. Thus, Sekou delayed his efforts to engage private counsel until the last possible moment.[6] The court was cognizant of the

---

[5] We are also unpersuaded that Sekou offered a credible explanation to the court at the June trial for his unseasonable efforts to contact private counsel when he stated that all of his letters to private counsel had been returned because of the prison closure. Sekou later contradicted that explanation when he testified at the habeas hearing that he had received a response to his letter to Flaherty, who had elected not to defend him.

[6] We also note that Sekou has failed to explain the absence in the record of any indication that he attempted to contact, through Diorio, any pri-

untimeliness of Sekou's efforts, as well as his prior deliberate attempt to delay his January trial. Therefore, the court was justified in concluding that Sekou's request for private counsel at the eleventh hour was a mere "ruse" to achieve the delay of his trial.

In addition, despite Sekou's personal unfamiliarity with Diorio and Galluzzo at the commencement of the June trial, any initial lack of communication between Sekou and his counsel was caused by Sekou's refusal to confer with them. Although under some circumstances a complete breakdown in communication between a defendant and his counsel may warrant appointment of new counsel; *State* v. *Gonzalez,* supra, 684; *State* v. *Gethers,* 193 Conn. 526, 543, 480 A.2d 435 (1984); a defendant is not "entitled to demand a reassignment of counsel simply on the basis of a 'breakdown in communication' which he himself induced." *McKee* v. *Harris,* 649 F.2d 927, 932 (2d Cir. 1981), cert. denied, 456 U.S. 917, 102 S. Ct. 1773, 72 L. Ed. 2d 177 (1982); see *State* v. *Gethers,* supra, 545. The trial court could reasonably have concluded that Sekou was entirely responsible for whatever lack of communication existed at the onset of the June trial; see *State* v. *Gonzalez,* supra, 684; and as a consequence, he is in no position now to complain about the situation. See *United States* v. *Grow,* supra, 209; *State* v. *Drakeford,* supra, 84. Moreover, as manifested in the record of the June trial and confirmed by Sekou's testimony at the habeas hearing, Sekou was in constant communication with Diorio and Galluzzo as the trial progressed.

---

vate attorney other than Pigeon during the June trial. Nor has he demonstrated that he would have been able to finance the services of a private attorney for the June trial, had one agreed to represent him. Sekou had represented himself to be indigent at the June trial, and Mahigel, his financial source for the January trial, testified at the habeas hearing that he had been unaware that Sekou had been retried in June.

In fact, Sekou has voiced no complaint, nor have we found any indication in the record, that Diorio and Galluzzo were incompetent or did not present his defense "in the light most favorable to him or in accordance with his wishes." *State* v. *Gethers,* supra, 546. As the court noted at the June trial, the office of the public defender had represented Sekou for approximately two years, and the court had no reason to assume that either Diorio or Galluzzo was unacquainted with Sekou's case. Neither attorney requested a continuance for the purpose of further preparation, and therefore, there was no indication to the court that they were unprepared for trial.

Consequently, we are unable to detect any "exceptional circumstances" in the record warranting a continuance for purposes of the replacement of Sekou's appointed counsel. *State* v. *Drakeford,* supra. We conclude, therefore, that the trial court neither abused its discretion nor deprived Sekou of his constitutional right to counsel of his choice in denying his request for a continuance.

## II

Sekou next claims that his appellate counsel rendered ineffective assistance in failing to raise and brief two preserved constitutional issues in his direct appeal in *State* v. *Saia,* 167 Conn. 286, 355 A.2d 88 (1974). According to Sekou, this court would have reversed his conviction and ordered a new trial if his appellate counsel had argued on appeal that the trial court violated his federal and state constitutional rights to a fair trial by ordering that he be shackled, straitjacketed, and guarded by a sheriff while he testified before the jury, and that the court violated his federal constitutional right to be present at his trial by refusing to permit him to be present in the courtroom unless shackled and straitjacketed. We disagree.

In order to prevail on this claim, Sekou must establish (1) that his appellate counsel's performance fell below the required standard of reasonable competence or competence displayed by lawyers with ordinary training and skill in the criminal law, and (2) that this lack of competency contributed so significantly to the affirmance of his conviction as to have deprived him of a fair appeal, thus causing an unreliable conviction to stand. See *Valeriano* v. *Bronson,* 209 Conn. 75, 84–86, 546 A.2d 1380 (1988); accord *Strickland* v. *Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984). If the issues not raised by his appellate counsel lack merit, Sekou cannot sustain even the first part of this dual burden since the failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation. Accord *Williams* v. *Manson,* 195 Conn. 561, 564, 489 A.2d 377 (1985). After reviewing the constitutional claims not raised in Sekou's direct appeal, we are unpersuaded that his appellate counsel rendered ineffective assistance in failing to pursue them in *State* v. *Saia,* supra, 167 Conn. 286.

## A

Sekou argues that he was deprived of his rights to a fair trial as guaranteed by the fourteenth amendment to the United States constitution and article first, § 8, of the Connecticut constitution[7] because: (1) the court failed to conduct a hearing with respect to the necessity for restraining him; (2) the court neglected to detail on the record the reasons for restraining him; (3) the use of restraints and the posting of a sheriff beside him

[7] Because the federal and state constitutions impose similar constitutional due process limitations, we have treated Sekou's federal and state due process claims together. See *State* v. *Flanders,* 214 Conn. 493, 500 n.4, 572 A.2d 983 (1990).

while he testified were unnecessary and excessive under the circumstances; (4) the court "delegated" the decision to restrain him to a sheriff; and (5) the court took no measures to protect him from being viewed prejudicially by the jury. We disagree with Sekou in each respect.

"As a general proposition, a criminal defendant has the right to appear in court free from physical restraints. . . . Grounded in the common law, this right evolved in order to preserve the presumption favoring a criminal defendant's innocence, while eliminating any detrimental effects to the defendant that could result if he were physically restrained in the courtroom." (Citations omitted.) *State* v. *Williams,* 195 Conn. 1, 5–6, 485 A.2d 570 (1985). "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Estelle* v. *Williams,* 425 U.S. 501, 503, 96 S. Ct. 1691, 48 L. Ed. 2d 126, reh. denied, 426 U.S. 954, 96 S. Ct. 3182, 49 L. Ed. 2d 1194 (1976). "The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment [to the United States constitution]"; id.; and is also safeguarded by article first, §§ 8 and 9, of the Connecticut constitution. See *State* v. *Lamme,* 216 Conn. 172, 177, 579 A.2d 484 (1990); *State* v. *Boyd,* 214 Conn. 132, 135, 570 A.2d 1125 (1990); *State* v. *Marra,* 195 Conn. 421, 425, 489 A.2d 350 (1985).

A criminal defendant's right to appear before the jury unfettered, however, is not absolute. See *Illinois* v. *Allen,* 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 353, reh. denied, 398 U.S. 915, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970). Since the trial judge "is best equipped to decide the extent to which security measures should be adopted to prevent disruption of the trial, harm to those in the courtroom, escape of the accused, and the

prevention of other crimes"; *United States* v. *Samuel,* 431 F.2d 610, 615 (4th Cir. 1970), cert. denied, 401 U.S. 946, 91 S. Ct. 964, 28 L. Ed. 2d 229 (1971); accord *Corey* v. *State,* 126 Conn. 41, 42–43, 9 A.2d 283 (1939); the decision to employ "[r]easonable means of restraint" upon a defendant when confronted with a reasonable necessity rests within the broad discretion of the trial court. Practice Book § 892; *State* v. *Woolcock,* 201 Conn. 605, 615, 518 A.2d 1377 (1986); see *State* v. *Williams,* supra, 8. The court's decision will not be disturbed on appeal unless it is shown that its discretion was clearly abused. *State* v. *Woolcock,* supra.

In ordering the use of restraints or denying a request to remove them, the court must ensure that its reasons for so ruling are detailed in the record. *State* v. *Williams,* supra, 7; see also Practice Book § 892. "An adequate record demonstrating the necessity for the use of the restraints imposed is essential to meaningful appellate review . . . ." *State* v. *Williams,* supra, 8. Although it is desirable that an evidentiary hearing be conducted with respect to the necessity for restraints, such a hearing is not mandatory. See *State* v. *Woolcock,* supra.

In this case, despite the court's failure to conduct a hearing inquiring into the necessity for restraints, the record amply demonstrates that the nature and duration of the restraints employed by the court were reasonably necessary under the circumstances. The court was aware of Sekou's history of insubordination and violence in penal institutions, which included an attack on a prison guard with a knife, and participation in a prison rebellion. See *United States* v. *Fountain,* 768 F.2d 790, 794 (7th Cir. 1985), cert. denied sub nom. *Gometz* v. *United States,* 475 U.S. 1124, 106 S. Ct. 1647, 90 L. Ed. 2d 191 (1986); *Dennis* v. *State,* 170 Ga. App. 630, 632, 317 S.E.2d 874 (1984); compare *State* v.

*Williams,* supra, 9. Sekou more directly exhibited his violent propensities to the court by toppling the audio-visual system, breaking benches in his cell, and shouting abusive epithets at the judge from his cell. See *Broadus* v. *State,* 487 N.E.2d 1298, 1305 (Ind. 1986); accord *Bolder* v. *Armontrout,* 713 F. Sup. 1558, 1578 (W.D. Mo. 1989); *Dennis* v. *State,* supra; compare *State* v. *Williams,* supra, 9. The court was also entitled to take into account Sekou's calculated effort to impede the progression of his January trial, and the psychiatric report evaluating him as an extremely dangerous man. See *State* v. *Woolcock,* supra, 616. In light of these circumstances, as well as Sekou's prior conviction for his attempt to aid in an escape from custody, and his ability to damage the audio-visual system while guarded by four sheriffs, the court reasonably concluded that the risk that Sekou might attempt to escape or do violence in the courtroom despite the presence of court security personnel outweighed Sekou's right to be present in court unrestrained. See *State* v. *Williams,* supra, 6; *Corey* v. *State,* supra, 42–43; *State* v. *Colvin,* 452 So. 2d 1214, 1219 (La. App.), cert. denied, 457 So. 2d 1199 (La. 1984); *Commonwealth* v. *Montgomery,* 23 Mass. App. 909, 911, 499 N.E.2d 853, rev. denied, 398 Mass. 1107, 503 N.E.2d 36 (1986).

In addition, the record reflects that the decision to restrain Sekou was not, as Sekou claims, delegated by the court to a sheriff. The court decided to restrain Sekou after consulting with the sheriff. Since it was presumably the sheriff, rather than the court, that "ha[d] the experience in the keeping of prisoners and who must provide the guards and bear the major responsibility if untoward incidents occur," the court was entitled to "rely heavily" upon the sheriff's advice. *United States* v. *Samuel,* supra, 615.

Moreover, contrary to Sekou's assertions, the court took measures to conceal Sekou's restraints from the

view of the jury by bringing him to and from the courtroom while the jury was absent, and allowing him to be covered with a sport coat while he testified. It was Sekou, rather than the court or the state, who brought his restraints to the attention of the jury. See *State* v. *Colvin,* supra, 1220; *State* v. *Staples,* 99 Wis. 2d 364, 375, 299 N.W.2d 270 (1980); compare *Bolder* v. *Armontrout,* supra, 1578. Even then, the court sought to minimize any possible prejudice that might have been created by Sekou's statements and the sight of his restraints by cautioning the jury not to draw any inference from the fact that Sekou had testified under restraint. There is no evidence in the record to rebut the presumption that the jury followed the court's curative instruction.

We conclude, therefore, that the trial court neither abused its discretion nor deprived Sekou of a fair trial by restraining him and stationing a sheriff beside him while he testified. Accordingly, we affirm the decision of the habeas court that the assistance rendered by Sekou's appellate counsel was not ineffective with respect to his failure to raise the claim.

## B

We now turn to Sekou's claim that his appellate counsel rendered ineffective assistance by failing to raise for our review in his direct appeal the claim that the trial court deprived him of his constitutional right to be present at his trial. The confrontation clause of the United States constitution guarantees to a criminal defendant the right to be present at all critical stages of his trial. See *State* v. *Gonzalez,* 205 Conn. 673, 688, 535 A.2d 345 (1987). We have recognized, however, that a defendant "may waive this right by his conduct, misconduct or his voluntary and deliberate absence from the trial without good cause." *State* v. *Drakeford,* 202 Conn. 75, 79, 519 A.2d 1194 (1987); see *Illinois* v. *Allen,*

397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 253, reh. denied, 398 U.S. 915, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970); Practice Book § 968. The "deliberate absence [of a defendant] without sound reason 'indicates nothing less than an intention to obstruct the orderly processes of justice . . . .' " *State* v. *Drakeford,* supra, 80, quoting *United States* v. *Tortora,* 464 F.2d 1202, 1208 (2d Cir.), cert. denied sub nom. *Santoro* v. *United States,* 409 U.S. 1063, 93 S. Ct. 571, 34 L. Ed. 2d 516 (1972).

Sekou concedes that he waived his right to be present at the beginning of his June trial by voluntarily absenting himself from the courtroom. He maintains, however, that his right to be present at his trial as guaranteed by the sixth amendment to the United States constitution was infringed when, thereafter, the court "forced him to remain absent from his trial" by refusing to permit him to enter the courtroom unless he was physically restrained. According to Sekou, the court should have informed him that he could be present without restraints if he promised not to misbehave. Sekou also contends that before restraining him, the court should have warned him personally and determined whether he understood that his misconduct while in his cell would "jeopardize" his right to be present at his trial, should he later choose to exercise it, without restraints.

As support for his claims, Sekou principally relies on *Illinois* v. *Allen,* supra. We disagree with Sekou that the court failed to abide by the constitutional principles set forth in *Allen.* In *Allen,* the United States Supreme Court held that a trial judge faced with an obstreperous defendant could undertake any one of three constitutionally permissible courses of action: "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; [or] (3) take him out of the courtroom

until he promises to conduct himself properly." Id., 344. Although the court expressed a preference for the expulsion of such a defendant from the courtroom, it nonetheless acknowledged that in certain situations, "binding and gagging might possibly be the fairest and most reasonable way to handle a defendant . . . ." Id. The court thus recognized that physical presence itself, maintained through the use of restraints, "to an extent compl[ied] with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial." Id.[8]

Because it would have been constitutionally permissible under *Allen* for the court to compel Sekou's presence through the use of restraints, we discern no sixth amendment violation in the course of action taken by the court. Essentially, the court permitted Sekou to choose between two equally permissible alternatives: presence under restraint, or absence coupled with mechanical observation of the proceedings. Having found the former alternative unsatisfactory, and thus having chosen the latter, Sekou cannot now claim that, by placing the choice in his hands, the court "forced" him to remain absent from his trial or effected a violation of his right of presence. Moreover, the restrictions on Sekou's entry into the courtroom directly resulted from his own contumacious behavior, and as we have held in Part II, above, it was reasonably necessary under the circumstances for the court to restrain Sekou.

[8] The court suggested in *Illinois* v. *Allen,* 397 U.S. 337, 344, 90 S. Ct. 1057, 25 L. Ed. 2d 253 (1970), that a defendant's confrontation rights might be undermined by his binding and gagging notwithstanding his physical presence in that "one of the defendant's primary advantages of being present at [his] trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint." Presumably because Sekou was not gagged, he does not claim, nor do we detect any evidence in the record, that his ability to communicate with his counsel was impaired by the restraints imposed upon him.

We conclude, therefore, that the court did not deprive Sekou of his constitutional right of presence by refusing to permit him to attend his trial without physical restraints.

We are likewise unpersuaded by Sekou's claims that *Allen* required the court to inform him that he could attend his trial unrestrained and to administer to him personally any warnings additional to those he had already received. In *Allen,* the United States Supreme Court held that before removing an unruly defendant from the courtroom, a trial court must first warn the defendant that he would be removed if he continued to disrupt the proceedings. Id., 343. The court also held that a defendant removed from the courtroom could reclaim his right of presence as soon as he was willing to behave appropriately. Id.

The United States Supreme Court did not announce in *Allen* a sixth amendment requirement that a defendant whose misconduct necessitated that he be physically restrained must thereafter be offered the opportunity to be freed of his restraints. We are unpersuaded that the right to be free of physical restraints is reclaimable by a defendant at any time as an adjunct to his sixth amendment right of presence. Although we have viewed favorably the removal of a defendant's restraints where circumstances permit; see *State* v. *Williams,* supra, 10; we have not suggested that such removal is constitutionally required. We decline to adopt such a requirement at this juncture, for to require a court to offer to remove a defendant's restraints upon his mere promise of proper behavior, notwithstanding the circumstances that necessitated his restraint in the first instance, would undermine the significance of its " 'duty to do what may be necessary to prevent escape, to minimize danger of harm to those attending trial as well as to the general public, and to maintain decent

order in the court room.' " Id., 6, quoting *Commonwealth* v. *Brown,* 364 Mass. 471, 475, 305 N.E.2d 830 (1973). The court is entitled to evaluate the sincerity of a defendant's promise of good behavior, and to determine whether the circumstances present in each case warrant an offer to remove his restraints. In light of the circumstances in this case as detailed in Part II above, we conclude that the court was justified in declining to offer to Sekou the opportunity to be present at his trial without physical restraints.

Finally, we find no constitutional infirmity in the warnings received by Sekou. Before he voluntarily waived his right of presence, Sekou was warned that the trial would continue in his absence if he failed to appear in the courtroom. See *State* v. *Gonzalez,* supra, 689; *State* v. *Drakeford,* supra, 79, 81; *Talton* v. *Warden,* 171 Conn. 378, 384, 370 A.2d 965 (1976). He does not dispute the adequacy of this warning, nor does he claim that he was not warned that he would be restrained if he continued to misbehave while in his cell. At the time of his misbehavior, Sekou had already voluntarily relinquished his right of presence and had not indicated any intention to be present in the courtroom. Thus, at that time, it was unnecessary for the court to administer to Sekou an additional personal warning directed to his previously forsaken right of presence. We find it incredible, moreover, that Sekou would not comprehend that his misconduct, for which he was warned that he would be restrained while in his cell, would "jeopardize" his right to be free of restraints in the courtroom.

We conclude, therefore, that the trial court did not deprive Sekou of his constitutional right to be present at his trial. Accordingly, Sekou has failed to meet his burden of establishing that his appellate counsel was ineffective because he did not raise this claim in his

direct appeal. Because we have also held that his appellate counsel was not ineffective in failing to pursue, on appeal, Sekou's claimed violation of his rights to a fair trial, the habeas court correctly determined that Sekou's petition for a writ of habeas corpus should be dismissed.

The judgment is affirmed.

In this opinion the other justices concurred.