******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAMES L. DAVIS III *v.* COMMISSIONER OF
CORRECTION
(AC 40090)

DiPentima, C. J., and Lavine and Sheldon, Js.

*Syllabus*

The petitioner, who previously had been convicted of manslaughter in the
first degree, assault in the first degree and carrying a pistol without a
permit, sought a writ of habeas corpus, claiming that his trial counsel
provided ineffective assistance. The habeas court rendered judgment
denying the habeas petition and, thereafter, denied the petition for certifi-
cation to appeal, and the petitioner appealed to this court. *Held:*

1. The habeas court did not abuse its discretion in denying the petition for
certification to appeal, the petitioner having failed to show that the
issues raised were debatable among jurists of reason, that a court could
have resolved the issues in a different manner, or that the questions
raised were adequate to deserve encouragement to proceed further.

2. The habeas court properly determined that the petitioner was not denied
his right to effective assistance of counsel:

a. The petitioner's claim that his trial counsel was ineffective by failing
to file a motion in limine to preclude certain firearm related evidence
found in a room where the petitioner had stayed was unavailing; the
petitioner's trial counsel testified that the admission into evidence of
the firearm related evidence was part of his third-party culpability
defense, and there was a strong presumption that the trial strategy
employed by the petitioner's trial counsel was reasonable and a result
of the exercise of professional judgment.

b. The petitioner's trial counsel was not ineffective by failing to consult
with or to present the testimony of an eyewitness identification expert;
trial counsel's performance was not deficient in light of the standards
in effect at the time of the petitioner's criminal trial, trial counsel's
theory of defense was not misidentification but, rather, was third-party
culpability, counsel was not required to call an expert and was entitled
to make strategic choices in preparation for trial, and the petitioner
made no showing as to how consulting with a memory expert would
have assisted trial counsel or that the result would have been different
had counsel done so.

c. The petitioner did not demonstrate that his trial counsel rendered
ineffective assistance by failing to object to the testimony of a laboratory
supervisor on the ground that her testimony violated the petitioner's
right to confrontation under the federal constitution, as articulated in
*Crawford* v. *Washington* (541 U.S. 36); at the time of the trial that
led to the petitioner's conviction, it was evident that the definition of
"testimonial" under *Crawford* was evolving, and trial counsel did not
render ineffective assistance by maneuvering within the existing law
and declining to advance a novel theory.

d. The petitioner's claim that his trial counsel was ineffective by failing
to prepare the petitioner for his presentence investigation interview
was unavailing; trial counsel was present during the interview, and the
petitioner made no showing that his honest comments made during the
interview regarding selling drugs or possessing a gun made a difference
in the sentence imposed.

Argued September 7—officially released December 4, 2018

*Procedural History*

Amended petition for a writ of habeas corpus,
brought to the Superior Court in the judicial district
of Tolland and tried to the court, *Fuger, J.*; judgment
denying the petition; subsequently, the court denied the
petition for certification to appeal, and the petitioner
appealed to this court. *Appeal dismissed.*

*Heather Clark*, for the appellant (petitioner)

*Michael L. Regan*, state's attorney, for the appellee (respondent).

*Opinion*

DiPENTIMA, C. J. The petitioner, James L. Davis III, appeals from the judgment of the habeas court denying his second amended petition for a writ of habeas corpus. On appeal, the petitioner claims that the court (1) abused its discretion in denying his petition for certification to appeal and (2) erred in concluding that his trial counsel had not rendered ineffective assistance by failing to (A) file a motion in limine to preclude certain evidence, (B) consult with and present the testimony of an eyewitness identification expert, (C) object to the testimony of a laboratory supervisor on the ground that the testimony violated his right to confrontation under the federal constitution and (D) prepare the petitioner for the presentence investigation interview. We dismiss the petitioner's appeal.

The following facts and procedural history are relevant to our resolution of the petitioner's claims. The petitioner was charged with murder by use of a firearm in violation of General Statutes § 53a-54a (a), attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2) and 53a-54a (a), three counts of assault in the first degree in violation of General Statutes § 53a-59 (a) (5) and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The matter proceeded to trial twice; both ended in mistrials due to the inability of the jury to reach a unanimous verdict. Following the petitioner's third trial, the jury returned a verdict of not guilty on the count of murder, but guilty of the lesser included offense of manslaughter in the first degree in violation of General Statutes § 53a-55a, not guilty of attempt to commit murder, guilty of three counts of assault in the first degree, and guilty of carrying a pistol without a permit. The trial court, *Hadden, J.*, accepted the verdict and sentenced the petitioner to a total effective sentence of forty-eight years imprisonment.

On direct appeal, our Supreme Court affirmed the petitioner's conviction. See *State* v. *Davis*, 283 Conn. 280, 929 A.2d 278 (2007). The following facts, which the jury reasonably could have found, were set forth on direct appeal: "The events in question took place in the early morning hours of November 14, 1999, at the Sportsmen's Athletic Club (club) at 40 High Street in Norwich. Joseph Ellis arrived at the club with Susan Gomez at approximately midnight. Ellis had arranged to meet Jermaine Floyd, Timothy McCoy and Xavier Cluff there. The [petitioner], Susan Gomez' estranged husband, and Ricky Gomez, Ron Pires, Clayton Ballinger and Yolanda Pires were in the poolroom of the club when Ellis arrived. Ellis went to the bar area, accompanied by Floyd and McCoy, and saw Ricky Gomez and Ron Pires, both of whom he knew, looking at him through a service window between the bar and the poolroom. Ellis then left the bar area and went to

the club's office to make arrangements for a birthday party. When he came out of the office, Ellis saw Ricky Gomez, Ron Pires and a third person whom he could not clearly see walk in and out of the bathroom several times. Ricky Gomez left the club, came back with something concealed under his jacket and again entered the bathroom. Gomez then left the bathroom, and, shortly thereafter, another person came out and started shooting a gun. The shooter's face was covered with a cloth of some type.

"The shooter first shot Joseph Dubose. He then shot Ellis in the left leg and went to the front door of the club, where he fired two more shots. He returned to Ellis and shot him in the right leg, upper right arm and armpit, and left forearm. At that point, the cloth over the shooter's face slipped, and Ellis recognized him as the [petitioner].

"At approximately 1:16 a.m. on November 14, 1999, members of the Norwich Police Department responded to an alarm at the club. Upon entering the club, they observed Dubose and Ellis lying on the floor with apparent gunshot wounds. One of the officers also observed that Floyd, who was able to stand on his own, had been shot in the buttocks. Emergency medical personnel transported Dubose, Ellis and Floyd to William W. Backus Hospital in Norwich. Cluff, who had been shot in the arm during the incident, arrived at the hospital by other means of transportation. Dubose was declared dead at approximately 2:11 a.m.

"Later on the day of the shooting, members of the Norwich Police Department, assisted by members of the state police eastern district major crime squad, recovered ten spent .40 caliber shell casings and eleven bullet fragments from the scene of the shooting. The Norwich police recovered two additional bullet fragments on November 16, 1999. All of the shell casings had been fired from the same .40 caliber Glock semiautomatic handgun.

"Several months prior to the shooting, in September, 1999, Wilfred Pepin had reported the theft of several guns, including a .40 caliber Glock semiautomatic handgun, from his residence in Lisbon. After the shooting, the Norwich Police Department contacted Pepin and inquired if Pepin had retained possession of any casings that had been discharged from the Glock handgun. Pepin was able to find three casings that he thought may have been discharged from the gun and provided them to the police. Two of those casings matched the casings that had been recovered at the club.

"On January 5, 2000, Adrianne Cook went to the Norwich police station and informed the police that the [petitioner] was staying at her apartment at 29 Carpenter Street in Norwich and that he had refused to leave. The police went to the apartment and arrested the [peti-

tioner] for criminal trespassing. They also seized a black duffel bag from the room in which the [petitioner] had been staying. The duffel bag contained a number of guns and gun paraphernalia that had been stolen from Pepin. Several of the items, including a gun case, a magazine clip, two screws, an Allen wrench and spare magazine holders, were linked to Pepin's .40 caliber Glock handgun, but the gun itself never was recovered." (Footnote omitted.) Id., 284–86.

In January, 2016, the petitioner filed his second amended petition for a writ of habeas corpus in which he alleged ineffective assistance of trial counsel, Michael Fitzpatrick, on several grounds. The habeas court, *Fuger*, *J.*, denied the petition. The court determined that Fitzpatrick had testified credibly and concluded that the petitioner had proven neither deficient performance nor prejudice. The petitioner filed a petition for certification to appeal, which the court denied. This appeal followed. Additional facts will be set forth as necessary.

I

The petitioner claims that the court abused its discretion in denying his petition for certification to appeal because it improperly denied his claims of ineffective assistance of counsel. We do not agree.

"Faced with a habeas court's denial of a petition for certification to appeal, a petitioner can obtain appellate review of the dismissal of his petition for habeas corpus only by satisfying the two-pronged test enunciated by our Supreme Court in *Simms* v. *Warden*, 229 Conn. 178, 640 A.2d 601 (1994), and adopted in *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). First, [the petitioner] must demonstrate that the denial of his petition for certification constituted an abuse of discretion. . . . Second, if the petitioner can show an abuse of discretion, he must then prove that the decision of the habeas court should be reversed on the merits. . . . To prove that the denial of his petition for certification to appeal constituted an abuse of discretion, the petitioner must demonstrate that the [resolution of the underlying claim involves issues that] are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further. . . .

"In determining whether the habeas court abused its discretion in denying the petitioner's request for certification, we necessarily must consider the merits of the petitioner's underlying claims to determine whether the habeas court reasonably determined that the petitioner's appeal was frivolous. In other words, we review the petitioner's substantive claims for the purpose of ascertaining whether those claims satisfy one or more of the three criteria . . . adopted by [our Supreme

Court] for determining the propriety of the habeas court's denial of the petition for certification." (Citations omitted; internal quotation marks omitted.) *Sanders* v. *Commissioner of Correction*, 169 Conn. App. 813, 821–22, 153 A.3d 8 (2016), cert. denied, 325 Conn. 904, 156 A.3d 536 (2017).

## II

We now examine the petitioner's underlying claims of ineffective assistance of counsel to determine whether the court abused its discretion in denying the petition for certification to appeal.

"It is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings . . . . This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . The second prong is . . . satisfied if the petitioner can demonstrate that there is a reasonable probability that, but for that ineffectiveness, the outcome would have been different. . . . An ineffective assistance of counsel claim will succeed only if both prongs [of *Strickland*] are satisfied." (Citations omitted; internal quotation marks omitted.) *Sanders* v. *Commissioner of Correction*, supra, 169 Conn. App. 823. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Mourning* v. *Commissioner of Correction*, 169 Conn. App. 444, 449, 150 A.3d 1166 (2016), cert. denied, 324 Conn. 908, 152 A.3d 1246 (2017).

## A

The petitioner claims that the court improperly failed to conclude that Fitzpatrick rendered ineffective assistance by failing to file a motion in limine to preclude certain firearm and firearm-related evidence found in a room where the petitioner had stayed, on the grounds that it was not relevant, was more prejudicial than probative and constituted uncharged misconduct. We are not persuaded.

The following additional facts are relevant. Pepin, a gun collector, testified at the criminal trial that, on September 27, 1999, twelve firearms were stolen from his residence, including a .40 caliber Glock semiautomatic, as well as items related to the Glock. A black duffel bag found by the police in the room where the defendant had been staying in Cook's apartment contained a number of firearms and firearm-related items that had been stolen from Pepin: two Smith & Wesson .45 caliber revolvers, as well as items that were related to the Glock: an Allen wrench and two screws; a Glock magazine plate, a spare magazine holder, and a gun case for the Glock. Pepin testified that some items that were recovered in the duffel bag did not belong to him: a .30 caliber magazine, two .30 caliber round magazines taped together end-to-end, a .22 caliber round magazine with eight rounds of ammunition, and a pouch with two .30 caliber round magazines. The duffel bag also contained clothing, and a receipt to Richard Gomez from Bebe and O'Neill, a law firm in Norwich. Pepin's Glock was not recovered.

Edward Jachimowicz, the state's firearm and tool mark identification expert, testified at the criminal trial that all ten spent shell casings found at the scene had been fired from the same .40 caliber Glock semiautomatic pistol. At the request of the Norwich police department, Pepin found three spent shell casings that he thought may have been discharged from the Glock, and testing revealed that the striations on two of the spent shell casings matched the striations on the casings recovered at the club. Jachimowicz testified that the .45 caliber Smith & Wesson revolvers found in the duffel bag were incapable of firing .40 caliber ammunition.

The petitioner argues that Fitzpatrick should have sought to exclude the two Smith & Wesson revolvers on the ground of relevancy. The petitioner contends that the Smith & Wesson revolvers were not the same caliber as the Glock used to commit the offenses and thus could not have fired the .40 caliber ammunition that struck the victims. He also argues that the state did not offer any evidence that the petitioner had stolen the Smith & Wesson revolvers from Pepin's residence, and that there was no indication as to who possessed the revolvers in the one and one-half months between the date of the offenses and the time when the revolvers were seized on January 5, 2000. The petitioner further argues that, assuming that the Smith & Wesson revolvers were relevant, those revolvers and the firearm-related evidence discovered by police in the duffel bag was more prejudicial than probative. He also contends that the firearms and the firearm-related evidence was inadmissible uncharged misconduct evidence.

We note that "[t]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency. . . . [T]here is a strong pre-

sumption that the trial strategy employed by a criminal defendant's counsel is reasonable and is a result of the exercise of professional judgment . . . ." (Citation omitted; internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 801, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004). Fitzpatrick testified at the habeas trial that the admission into evidence of the firearms and firearm-related items in the duffel bag was part of his third-party culpability defense. Fitzpatrick explained at the habeas trial that if Ricky Gomez had possession of the duffel bag and, therefore, had possession of Pepin's Smith & Wesson firearms, "then arguably he was in possession of the Glock." The habeas court determined that Fitzpatrick testified "admirably" and that it took "no issue with the actions to which . . . Fitzpatrick testified."

Fitzpatrick did not render deficient performance when he failed to file a motion in limine to preclude evidence that he thought would assist his theory of defense.[1] The inference that whoever possessed the duffel bag containing Smith & Wesson revolvers along with other items stolen from Pepin also had possessed Pepin's Glock, supported the petitioner's third-party culpability defense that the crimes had been perpetrated by Ricky Gomez, whose receipt from Bebe and O'Neill was in the duffel bag, or by Ballinger. If the jury believed the state's theory, the firearm related evidence would tend to inculpate the petitioner; however, if the jury had believed Fitzpatrick's defense, the evidence would have tended to point a finger at one of the third parties as the perpetrator. "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect. . . . After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (Citation omitted; internal quotation marks omitted.) *Harrington* v. *Richter*, 562 U.S. 86, 109–10, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Accordingly, we conclude that the habeas court properly determined that Fitzpatrick's representation was not deficient, under *Strickland*, with respect to his decision not to file a motion in limine with respect to the firearm and firearm related evidence in the duffel bag.

B

The petitioner next claims that the court improperly failed to conclude that Fitzpatrick rendered ineffective assistance (1) for failing to present the testimony of an

eyewitness identification expert and (2) for failing to consult an eyewitness identification expert to prepare for witness examinations, closing argument and jury instructions. We disagree.

At the habeas trial, the petitioner presented as an expert witness, Deryn Strange, a cognitive psychologist who specializes in memory and memory distortion. Strange testified that there are three stages of memory: encoding, storage, and retrieval. Strange explained the factors that can impact memory negatively during each of the three stages of memory. At the habeas trial, the petitioner's habeas counsel explained that "Fitzpatrick could have consulted with an expert and could have used that in requesting a jury instruction . . . and could have used that in closing in focusing the jury on the factors that would affect the witness's memory; particularly . . . Ellis, since his credibility was so focal to the case." The habeas court determined that Strange's testimony bore "little to no relevance to the question of effective representation of the criminal trial defense counsel."

The petitioner cannot prevail on his claim that Fitzpatrick performed deficiently by not presenting the testimony of an eyewitness identification expert. The recent case of *Bennett* v. *Commissioner of Correction*, 182 Conn. App. 541, 190 A.3d 877, cert. denied, 330 Conn. 910, 193 A.3d 50 (2018), is directly on point. In that case, as in the present case, the controlling law at the time of the underlying criminal trial, "on the issue was *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 49 A.3d 705 (2012), in which our Supreme Court observed 'that the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question. . . . Such testimony is also disfavored because . . . it invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony.'" Id., 562. Although *Kemp* was overruled in 2012, we consider Fitzpatrick's performance in light of the standards in effect at the time of the petitioner's criminal trial in 2004, and conclude that the habeas court did not err in concluding that Fitzpatrick's performance was not deficient. See id., 561. "Counsel . . . performs effectively when he elects to maneuver within the existing law . . . ." (Internal quotation marks omitted.) Id.

Moreover, Fitzpatrick testified at the habeas trial that his theory of defense was not misidentification, but rather was third-party culpability, and that Ellis had a motive to lie and implicate the petitioner. He stated that he did not consult an eyewitness identification expert "because that was not the horse I chose to ride in this case." "[T]here is no requirement that counsel call an expert when he has developed a different trial

strategy." *Stephen J.R.* v. *Commissioner of Correction*, 178 Conn. App. 1, 13, 173 A.3d 984 (2017), cert. denied, 327 Conn. 995, 175 A.3d 1246 (2018). "[T]here is no per se rule that requires a trial attorney to seek out an expert witness. . . . Furthermore, trial counsel is entitled to make strategic choices in preparation for trial." (Internal quotation marks omitted.) *Brian S.* v. *Commissioner of Correction*, 172 Conn. App. 535, 542, 160 A.3d 1110, cert. denied, 326 Conn. 904, 163 A.3d 1204 (2017).

The petitioner also claims that the court erred in declining to conclude that Fitzpatrick performed deficiently by failing to consult an eyewitness identification expert in preparation for trial. We disagree. Fitzpatrick's decision not to pursue a misidentification defense and, therefore, not to consult an eyewitness identification expert does not amount to deficient performance. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 680, 51 A.3d 948 (2012). "[T]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense." (Internal quotation marks omitted.) *Kellman* v. *Commissioner of Correction*, 178 Conn. App. 63, 77–78, 174 A.3d 206 (2017). The petitioner has not shown how consultation with a memory expert would have assisted Fitzpatrick when he chose to pursue a third-party culpability defense rather than a misidentification defense.

Furthermore, the petitioner has not demonstrated that there is a reasonable probability that had Fitzpatrick consulted with an expert and introduced expert testimony, the result would have been different. The petitioner's argument focuses on two of the state's witnesses, Ellis and Bickham. In his brief, the petitioner describes Strange's testimony as it relates to the changes in Ellis and Bickham's testimony over the course of the three trials. The petitioner has not shown how consultation with an eyewitness identification expert would have impacted Fitzpatrick's performance at trial, or altered his cross-examination of Ellis and Bickham. At the third criminal trial, Fitzpatrick thoroughly cross-examined Ellis on his intoxication, motive to lie and inconsistencies in his testimony in the three trials. Fitzpatrick also extensively cross-examined Bickham on the inconsistencies in his testimony at the three trials with respect to his description of the perpetrator. In light of this, we agree with the habeas court that Strange's testimony establishes neither deficient performance nor prejudice. "It is well established that a petitioner in a habeas proceeding cannot rely on mere conjecture or speculation to satisfy either the performance or prejudice prong but must instead offer demonstrable evidence in support of his claim." (Internal

quotation marks omitted.) *Lopez* v. *Commissioner of Correction*, 142 Conn. App. 53, 59, 64 A.3d 334 (2013). Accordingly, the petitioner's claim cannot prevail under *Strickland*.

C

The petitioner next claims that Fitzpatrick provided ineffective assistance by failing to object to the testimony of a laboratory supervisor, Debra Messina, on the ground that her testimony violated his right to confrontation under the federal constitution, as articulated in *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), in the absence of testimony from the criminalist, Fung Kwok, who had performed the physical testing on the items submitted to the laboratory. We are not persuaded.

Messina, the supervising criminalist at the state forensic lab, testified as to the processes used in examining Ballinger's hands and football jersey for gunshot residue. Kwok performed the tests on the submitted items. Messina's role, as Kwok's supervisor, was to ensure that he followed procedure. Messina reviewed Kwok's worksheets and results and signed the laboratory report that Kwok generated. Kwok testified at the first trial regarding his examination of the submitted items and was subject to cross-examination by Fitzpatrick. Kwok did not testify at the petitioner's second or third trial.

*Crawford* v. *Washington*, supra, 541 U.S. 36, was decided on March 8, 2004, and the petitioner's third trial was held in May and June of 2004. "In *Crawford* v. *Washington*, [supra, 541 U.S. 36], the [United States] Supreme Court substantially revised its approach to confrontation clause claims. Under *Crawford*, testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity [to cross-examine the witness who is otherwise] unavailable to testify at trial. . . . In adopting this categorical approach, the court overturned existing precedent that had applied an open-ended balancing [test] . . . conditioning the admissibility of out-of-court statements on a court's determination of whether the proffered statements bore adequate indicia of reliability." (Citations omitted; internal quotation marks omitted.) *State* v. *Buckland*, 313 Conn. 205, 212, 96 A.3d 1163 (2014), cert. denied,     U.S.    , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015).

The United States Supreme Court, in *Crawford*, "declined to define the terms testimonial and nontestimonial . . . ." *State v. Kirby*, 280 Conn. 361, 380, 908 A.2d 506 (2006). Five years after the petitioner's third trial, the United States Supreme Court in *Melendez–Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), addressed the meaning of "testimonial" in the context of certificates of analysis setting forth the results of forensic testing. The court

held that the certificates stating that the submitted substance was cocaine were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination" and that the "affidavits were testimonial statements, and the analysts were 'witnesses' for the purposes of the Sixth Amendment." (Internal quotation marks omitted.) Id., 310–11.

In 2018, this court determined in *State* v. *Walker*, 180 Conn. App. 291, 183 A.3d 1, cert. granted, 328 Conn. 934, 183 A.3d 634 (2018), that testimony of a forensic science examiner regarding her comparison of two DNA profiles, one of which was generated by another analyst, did not violate the defendant's right to confrontation because "the primary analyst who performed and supervised the generation and analysis of the DNA profiles and resulting findings, testified and was available for cross-examination." Id., 307. The *Walker* court reasoned, citing *Melendez–Diaz* v. *Massachusetts*, supra, 557 U.S. 305, that "it is not the case . . . that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. . . . Although [i]t is the obligation of the prosecution to establish the chain of custody . . . this does not mean that everyone who laid hands on the evidence must be called. . . . [G]aps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." (Citation omitted; internal quotation marks omitted.) Id., 303. Our Supreme Court granted certification in *Walker* on this issue.[2]

Approximately two months prior to the petitioner's third trial, the Supreme Court released *Crawford*. At that time, Fitzpatrick did not have the guidance from *Melendez-Diaz* and its progeny on the definition of "testimonial" or from *State* v. *Walker*. It is evident that the issue was evolving at the time of the petitioner's third trial, and Fitzpatrick did not render ineffective assistance for declining to advance a novel theory. "[W]hile the failure to advance an established legal theory may result in ineffective assistance of counsel under *Strickland*, the failure to advance a novel theory never will . . . [and] [c]ounsel cannot be faulted for failing to advance a novel legal theory which has never been accepted by the pertinent courts . . . . Counsel instead performs effectively when he elects to maneuver within the existing law, declining to present untested . . . legal theories. . . . [R]easonably effective representation cannot and does not include a requirement to make arguments based on predictions of how the law may develop . . . ." (Citations omitted; internal quotation marks omitted.) *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 461–62, 880 A.2d 160 (2005), cert. denied sub nom. *Ledbetter* v. *Lantz*, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). The petitioner has failed to satisfy *Strickland's*

performance prong, and therefore he cannot prevail on this claim.

D

The petitioner last claims that Fitzpatrick rendered ineffective assistance when he failed to prepare the petitioner for the presentence investigation interview. We disagree.

Fitzpatrick testified at the habeas trial that he was present with the petitioner during the presentence interview. He did not recall whether he had met with the petitioner in preparation for the presentence interview. The petitioner testified that he met with Fitzpatrick prior to the presentence interview and that Fitzpatrick told him to be honest in the interview. During the presentence interview, the petitioner admitted that he began selling drugs in 1998, and that he had been suspended from high school for possessing a gun. The presentence investigation report indicates that Fitzpatrick advised the petitioner not to discuss pending charges in that it notes that the petitioner declined to comment on his version of the events "based on an appeal that will take place in the future." At sentencing, the court stated that "it would appear, having reviewed the evidence in this case and reviewing the presentence investigation report, that this is an incident that arises from a subculture of violence, a subculture of drug dealing, a subculture of protection of turf, none of which may be tolerated by society, none of which can be tolerated by this court." The petitioner's total exposure was over 100 years and the petitioner received a sentence of forty-eight years imprisonment.

The petitioner has not satisfied the prejudice prong of *Strickland*. Although the court referenced the presentence investigation report at sentencing, the court gave no indication that the petitioner's comments during the presentence investigation interview regarding selling drugs or possessing a gun had an impact on the sentence imposed. The petitioner's suggestion that the sentencing court relied on those statements in sentencing him is speculative. Because the petitioner has not demonstrated that his honest comments made during his sentencing interview made a difference in the sentence imposed, we conclude that the court properly rejected the petitioner's claims of ineffective assistance of counsel. See *Ruffin* v. *Commissioner of Correction*, 106 Conn. App. 396, 400, 943 A.2d 1105, cert. denied, 286 Conn. 922, 949 A.2d 481 (2008).

Accordingly, we conclude that the petitioner has not shown that the issues raised in his petition for a writ of habeas corpus as resolved by the court are debatable among jurists of reason, that a court could resolve the issues in a different manner or that the questions raised deserve encouragement to proceed further. Therefore, the petitioner has failed to demonstrate that the court's

denial of his petition for certification to appeal reflects an abuse of discretion.

The appeal is dismissed.

In this opinion the other judges concurred.

[1] We also note that had Fitzpatrick filed a motion in limine, it is highly unlikely that the trial court would have granted the motion as to the Smith & Wesson firearms and the items relating to Pepin's Glock. It is likely that the court would have determined that the Smith & Wesson firearms and the items relating to the Glock that had been stolen from Pepin (1) were highly probative of the identity of the individual who had had possessed Pepin's Glock and, by reasonable inference, had committed the crimes charged and (2) were not evidence of prior misconduct because they directly tend to prove guilt. "[T]he failure to pursue unmeritorious claims cannot be considered conduct falling below the level of reasonably competent representation." *Sekou* v. *Warden*, 216 Conn. 678, 690, 583 A.2d 1277 (1990). Although it may be less clear how the court might have ruled regarding the items in the duffel bag that did not belong to Pepin, even if those items were inadmissible, there is no proposition that counsel must always seek to exclude objectionable evidence; rather our jurisprudence "mandates deference to the tactics of trial counsel." See *Toccaline* v. *Commissioner of Correction*, supra, 80 Conn. App. 802.

[2] The certified question is: "Did the Appellate Court properly determine that the defendant's sixth amendment right to confrontation was not violated by testimony from a lab analyst regarding a known DNA profile generated from a swab processed by another analyst who did not testify at trial?" *State* v. *Walker*, 328 Conn. 934, 183 A.3d 634 (2018).