******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# J'VEIL OUTING *v.* COMMISSIONER
# OF CORRECTION
# (AC 41224)

Lavine, Moll and Bishop, Js.

*Syllabus*

The petitioner, who had been convicted of murder in connection with the
shooting death of the victim, sought a writ of habeas corpus, claiming,
inter alia, that his trial counsel and appellate counsel had rendered
ineffective assistance. The petitioner alleged, inter alia, that his trial
counsel improperly failed to present an alibi defense and to rebut the
testimony of N and R, who had given statements to the police indicating
that they had seen the petitioner shoot the victim and had identified
him from police photographic arrays. The petitioner further alleged that
his trial counsel improperly failed to obtain a ruling from the trial court
as to the admissibility at trial of certain testimony by his expert witness,
D, concerning the reliability of witness identifications. D's proffered
testimony had been excluded during a previous hearing on the petition-
er's unsuccessful motion to suppress the identification evidence of N
and R after they had recanted their statements to the police and their
identifications of the defendant, which they claimed were the result of
police coercion. After N and R disavowed their statements to the police,
the petitioner's trial counsel decided not to present D's testimony at
trial on mistaken identity and changed her approach to the case from
one of mistaken identification to a claim of police coercion. The habeas
court concluded that the petitioner had failed to establish deficient
performance or prejudice with respect to his claims of ineffective assis-
tance of trial or appellate counsel. The habeas court thereafter rendered
judgment denying the petitioner's habeas petition, from which the peti-
tioner, on the granting of certification, appealed to this court. *Held*:

1. The habeas court properly determined that the petitioner's trial counsel
   did not render ineffective assistance:
   a. There was ample support for the habeas court's conclusion that trial
   counsel's decision not to present an alibi defense was not constitution-
   ally deficient; trial counsel testified that she was concerned that pre-
   senting an alibi defense could do more harm than good, as the purported
   alibi witnesses placed the petitioner in the vicinity of his home, which
   was approximately one mile from the murder scene, at various times
   during the early evening of the murder, their testimonies were inconsis-
   tent and varied as to the times that they saw the petitioner and as to
   their descriptions of him, and many of the witnesses conceded that they
   could not account for the petitioner's whereabouts throughout the entire
   time period during which the events at issue occurred.
   b. Trial counsel was not ineffective in deciding to forgo additional investi-
   gation and rebuttal of the eyewitness statements of N and R, and to
   forgo D's testimony at trial on the issue of misidentification: the record
   reflected that part of trial counsel's third-party culpability theory was
   to establish that the statements to the police that were made by N and
   R were the product of police coercion, her cross-examination of N and
   R advanced that theory, and although additional investigation into the
   statements by N and R may have shed more light on their credibility,
   the evidence in the record did not support a conclusion that trial coun-
   sel's failure to conduct that additional investigation was unreasonable;
   moreover, the record was clear that trial counsel's decision not to call
   D as an expert witness at trial was based on concern that doing so
   would have potentially detracted from the petitioner's coercion defense
   and, thus, was a reasonable tactical choice under the circumstances.
   c. Trial counsel did not perform deficiently by not preserving for appel-
   late review a claim related to the trial court's exclusion of D's testimony
   regarding factors concerning eyewitness identifications; because trial
   counsel already reasonably determined not to present D's testimony at
   the petitioner's criminal trial, she would have had no strategic reason
   to preserve the court's exclusion of evidence on a matter that she
   reasonably believed had been rendered moot by her tactical choice not

to pursue a theory of mistaken identification, at the time of the criminal trial, decisional law did not permit expert testimony on the subjects for which trial counsel initially sought to present D's testimony, and to impose on counsel the duty to foretell what tack the Supreme Court would take on that subject would represent the height of post hoc reasoning, which is not the task of a court on habeas review.

2. The petitioner could not prevail on his claim that his appellate counsel was ineffective in failing to claim, in his direct appeal, that the trial court incorrectly denied the petitioner's request to present surrebuttal evidence; appellate counsel made a reasonable, strategic decision not to raise the surrebuttal issue, which fell within the wide range of reasonable professional assistance, and a court will not second-guess an appellate counsel's tactical decision to limit the claims briefed to those that he or she reasonably viewed as most critical to the appeal.

3. The petitioner's assertion that the habeas court incorrectly determined that he did not prove his claim of actual innocence was unavailing, that court having aptly concluded that the mosaic of evidence presented by the petitioner did not constitute affirmative proof of actual innocence, as it did not tend to establish, in relation to the other evidence in the case, that he could not have committed the crime.

Argued March 14—officially released June 11, 2019

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Oliver, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court; thereafter, the court, *Oliver, J.*, granted the petitioner's motion for rectification. *Affirmed.*

*David R. Kritzman*, assigned counsel, with whom, on the brief, was *Joshua C. Shulman*, assigned counsel, for the appellant (petitioner).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were, *Patrick J. Griffin*, state's attorney, and *Adrienne Russo*, deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

BISHOP, J. The petitioner, J'Veil Outing, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. On appeal, the petitioner claims that the habeas court erred in concluding that his trial counsel had not provided ineffective assistance in failing (1) to properly investigate and present an alibi defense, (2) to properly investigate and rebut the testimony of the eyewitnesses to the murder at issue, and (3) to adequately preserve an issue regarding expert testimony on eyewitness identification. The petitioner also claims that the court erred in concluding that his appellate counsel was not ineffective for failing to raise the issue, on direct appeal, of the trial court's refusal to permit surrebuttal evidence. Finally, the petitioner claims that the court incorrectly determined that he had not met his burden of proof regarding his claim of actual innocence. We affirm the judgment of the habeas court.

The record reveals that, after a jury trial, the petitioner was convicted on March 20, 2006, of murder in violation of General Statutes § 53a-54a. Thereafter, the petitioner was sentenced to fifty years of imprisonment. The petitioner's conviction was affirmed on direct appeal. *State* v. *Outing*, 298 Conn. 34, 86, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).[1] In that appeal, our Supreme Court recited the following underlying facts that the jury reasonably could have found:

"At approximately 6:50 p.m. on June 23, 2005, Nadine Crimley was walking in a northerly direction on Canal Street in New Haven, pushing her infant son in a stroller. To her left, she saw her brother, Ray Caple, standing on the porch of her residence at 150 Canal Street. As Crimley walked up the street, she saw the [petitioner], whom she previously had seen in the neighborhood, pass her on his bicycle. Another unidentified man rode a bicycle in front of the [petitioner]. Crimley then turned her attention back to her son. When she heard a series of popping noises, she looked up and saw the [petitioner], who was about ten feet away from her, firing a gun at the victim, Kevin Wright. The victim fell to the ground, and the [petitioner] ran from the scene.

"Caple, who had gone to high school with the [petitioner] and had known him for three and one-half years, also watched the [petitioner] as he rode his bicycle up Canal Street. As Caple watched, the [petitioner] moved his right hand toward his waist. Caple believed that the [petitioner] was reaching for a gun and was going to shoot him, but decided against doing so because Caple was holding his two year old daughter. Caple's mother and the victim were inside the residence at 150 Canal Street. Just after the [petitioner] passed the residence on his bicycle, the victim exited through the back door

of the residence, retrieved his bicycle from the backyard and walked with it in an easterly direction on Gregory Street toward its intersection with Canal Street. As Caple stood on the porch, he heard a gunshot and the sound of a bicycle falling to the ground. When he looked around the corner of the porch, he observed Crimley and her son standing very close to the [petitioner], and he also saw the [petitioner], who had dismounted from his bicycle, fire three more shots at the victim. The [petitioner] then ran away, leaving his bicycle in the street. Caple ran to the victim, who was unresponsive. The victim died from a single gunshot wound to the chest.

"Shortly, after 10 p.m. on the day of the shooting, Crimley gave a statement to the New Haven police in which she indicated that she had been able to get a good look at the shooter and would be able to identify him. On June 27, 2005, four days after the shooting, Stephen Coppola, a New Haven police detective, interviewed Crimley and presented her with an array of eight photographs, including one of the [petitioner]. Crimley identified the [petitioner] as the shooter and signed and dated the photographic array. Coppola tape-recorded his interview of Crimley. On the same day, Coppola also tape-recorded a statement from Caple and presented him with a second photographic array. Caple also identified the [petitioner] as the shooter and signed and dated the photographic array.

"Prior to trial, both Caple and Crimley recanted their statements to the police and their identifications of the [petitioner], claiming that they had been pressured by the police into giving the statements and making the identifications. Thereafter, the [petitioner] filed motions to suppress the identification evidence, claiming that the evidence was unreliable and the product of an unnecessarily suggestive police identification procedure. At a hearing on the [petitioner's] motions, both Crimley and Caple testified that they did not know who had killed the victim, that they had been pressured by the police to give false statements about the events surrounding the shooting, and that the police had pressured them to falsely identify the [petitioner] as the shooter. Crimley and Caple acknowledged that they were extremely frightened about being called as witnesses for the state and identifying the [petitioner] as the shooter. Coppola and Alfonso Vasquez, a New Haven police detective who had been present during Coppola's interviews of Crimley and Caple, testified that each of the witnesses had identified the [petitioner] as the shooter by selecting the [petitioner's] photograph from the photographic array spontaneously and without hesitation. The two detectives unequivocally denied that they had pressured or influenced either Crimley or Caple in any way.

"At the conclusion of the detectives' testimony, the

state maintained that the tape-recorded statements that Crimley and Caple had given to the police met the requirements for admissibility set forth in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). The trial court found that the testimony of Crimley and Caple that they had been pressured to give false statements and to falsely identify the [petitioner] as the shooter was not credible. The court further concluded that the statements that they had given to the police met the *Whelan* admissibility requirements for purposes of the suppression hearing.

"Thereafter, at a continuation of the suppression hearing, the [petitioner] made an offer of proof regarding the testimony of his expert witness, Jennifer Dysart, concerning the reliability of eyewitness identifications. The state objected to the testimony, and the court sustained in part and overruled in part the state's objection to Dysart's proffered testimony. Dysart thereafter offered her opinion that the identification procedures used generally were not reliable. The trial court thereafter denied the [petitioner's] motions to suppress the photographic identifications that had been made of the [petitioner] by Crimley and Caple.

"At trial, Crimley and Caple testified that the police had pressured them to give false statements and to falsely identify the [petitioner] as the shooter. They further testified that the [petitioner] definitely was not the shooter and that they did not know who had shot the victim. Upon the state's motion pursuant to *Whelan*, the trial court admitted redacted tape recordings of the statements Crimley and Caple had given to the police as prior inconsistent statements. The trial court also admitted as exhibits copies of the photographic arrays that Crimley and Caple had signed and dated. The [petitioner] did not call Dysart as a witness at trial.

"Thereafter, the jury found the [petitioner] guilty of murder, and the trial court rendered judgment in accordance with the verdict, sentencing the [petitioner] to a term of imprisonment of fifty years." (Footnotes omitted.) Id., 38–41.

After our Supreme Court affirmed his conviction, the petitioner filed a petition for a writ of habeas corpus dated October 5, 2010. The matter was tried on the petitioner's fifth amended petition, dated February 26, 2015, in which he set forth claims of ineffective assistance of trial and appellate counsel, a due process claim regarding the presentation of evidence at trial, and a claim of actual innocence.[2] The hearing on this matter before the habeas court, *Oliver, J.*, began on March 21, 2016, and continued intermittently for eight days, concluding on November 22, 2016. Following the receipt of posttrial briefs, the court issued its memorandum of decision on November 20, 2017, denying the petition.[3] In denying the petition, the habeas court concluded that

the petitioner had not met his burden of establishing either deficient performance or prejudice with respect to several of his ineffective assistance of trial counsel claims, including the claims that his trial counsel failed to properly investigate and to present an alibi defense, to investigate and to rebut the testimony of the state's eyewitnesses, and to preserve the record concerning the trial testimony of an expert witness on witness identifications. The court further concluded that the petitioner failed to sustain his burden of establishing deficient performance or prejudice with respect to his ineffective assistance of appellate counsel claim, and that the petitioner failed to establish his actual innocence. The court deemed the remainder of the petitioner's ineffective assistance of trial and appellate counsel claims to be abandoned on the basis of the petitioner's failure to address them in his posttrial brief. The court granted the petitioner's petition for certification to appeal, and this appeal followed.[4] Additional facts and procedural history will be set forth as necessary.

I

The petitioner raises three claims that his trial counsel rendered ineffective assistance. Before addressing each claim, we set forth the relevant legal principles and our well settled standard of review governing ineffective assistance of counsel claims. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, 158 Conn. App. 431, 437, 119 A.3d 607 (2015); see also *Buie* v. *Commissioner of Correction*, 187 Conn. App. 414, 417, 202 A.3d 453, cert. denied, 331 Conn. 905, 202 A.3d 373 (2019).

"In *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)], the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction. . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . .

"To prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. . . . *Competent representation is not to be equated with perfection. The constitution guaran-*

tees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, *the* [*petitioner*] *must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.* . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Emphasis added; internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 217–18, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017).

"With respect to the prejudice component of the *Strickland* test, the petitioner must demonstrate that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. . . . It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings. . . . Rather, [t]he [petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Citation omitted; internal quotation marks omitted.) *Mukhtaar* v. *Commissioner of Correction*, supra, 158 Conn. App. 438; *Holloway* v. *Commissioner of Correction*, 145 Conn. App. 353, 365, 77 A.3d 777 (2013).

Finally, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* v. *Washington*, supra, 466 U.S. 697. Guided by these principles, we turn to the specific claims made by the petitioner.

## A

We first turn to the petitioner's claim that his trial counsel failed to properly investigate and to present an

alibi defense. The following additional information is relevant to our discussion of this claim. The record reflects that on June 23, 2005, the New Haven police received a telephone call regarding a shooting at 6:55 p.m. on Canal Street in New Haven, a separate call regarding a street fight in the neighborhood of the petitioner's residence at 7:10 p.m., and another call relating to the fight at 7:23 p.m. The record reflects, as well, that the police received a call at 7:57 p.m. regarding a scooter chase. At the time, the petitioner lived at 24 Harding Place in New Haven.

During the habeas hearing, the petitioner presented the testimony of then Attorney Auden C. Grogins,[5] who had represented the petitioner in the underlying criminal trial. Grogins testified that, although she had investigated the potential alibi defense and that either she or an investigator retained by her had reached out to some of the alibi witnesses identified by the petitioner, she had ultimately concluded that an alibi defense was not strong and that presenting such a defense could, in fact, be harmful to the petitioner at trial. Grogins' reasoning in that regard was multifaceted. She stated that she had considered the quality of the alibi witnesses and the fact that all of them were either family members or close friends with the petitioner's family. She also had considered that, although all of the alibi witnesses saw the petitioner on the street near his home during the day of the murder, none of them could pinpoint the petitioner's whereabouts at the time of the shooting. She further indicated that sightings of the petitioner shortly after the murder at locations less than one mile from the murder scene would have not only been unhelpful to the petitioner, but would, in fact, have placed him in the vicinity of the crime.

Grogins testified, as well, that her determination not to present an alibi defense was informed by her knowledge that the petitioner initially had stated to the police when he was arrested that he did not recall where he was at the time of the murder, but had then provided a list of alibi witnesses the next morning, facts she believed would have undercut any alibi testimony. Finally, in regard to an alibi defense, she indicated that presenting such a defense could have detracted from a third-party culpability defense, which she had believed was stronger. Grogins further testified that she had ultimately concluded, on the basis of her experience as a trial attorney, that the presentation of an incomplete alibi defense, bolstered only by friends and relatives of the accused, often undermines the defendant's defense in a murder trial.

Evidence also was presented at the habeas hearing that the petitioner had given Grogins a list of potential alibi witnesses and that he had asked her to present an alibi defense. In particular, the petitioner presented several witnesses at the habeas hearing who claimed

to have seen the petitioner in his neighborhood close to the time the shooting occurred. Nakia Black-Geter, a close friend of the petitioner's sister, testified that the petitioner was present when she had arrived at his home between 5 p.m. and 6 p.m. She testified, as well, that the petitioner had been present during the fight, although she could not say whether he was there for the entire time. Finally, she could not recall whether the petitioner was riding a bicycle when she had seen him in the vicinity of the fight.

Additionally, Antjuan Martin, the petitioner's cousin, agreed with defense counsel that he had started "hanging out" with the petitioner at 11 a.m. on the day in question and that he had seen the petitioner riding around on a mountain bicycle during the fight. He indicated, as well, that the petitioner had been out of his sight for approximately ten minutes while the petitioner rode his bicycle to Moe's Market before the fight started.[6] Martin had no recollection of the clothes that the petitioner had been wearing or the color of the bicycle that he had been riding. Dijon Wiggins, who lived across the street from the petitioner's home, also testified that he had observed the petitioner at the fight and later during the scooter chase. Wiggins recalled that the petitioner had been riding on a mountain bicycle, but he did not recall whether the petitioner had been on the bike before the fight began.

Furthermore, Natasha Outing, the petitioner's sister, testified that she arrived home from work between 5 p.m. and 5:30 p.m. She indicated that the petitioner had been present for the fight and had been riding a ten speed bicycle up and down the street, although she conceded that she had not seen the petitioner the entire time. She recalled that the petitioner had been wearing a blue dickey[7] shirt, jeans, and a baseball cap. She indicated, as well, that kids in the neighborhood had been in the habit of sharing bicycles.

Finally, Eric Williams, a cousin of both the petitioner and the victim, indicated that he had a close relationship with the petitioner and testified that the petitioner had been present at the beginning of the fight. Williams also testified that the petitioner was in Moe's Market when Williams' mother had called to tell him about the shooting. Williams recalled that the petitioner had been wearing a dickey shirt, but no hat, during the fight, that the petitioner had been riding either a mountain bicycle or a "baja" bicycle, and that he had not seen the petitioner on the bicycle during the fight. He also indicated that he had not been with the petitioner prior to the time he witnessed the petitioner watching the fight.

The petitioner also presented evidence from Donald Light, a private investigator retained by Grogins, and Mike Udvardi, a private investigator retained by habeas counsel. Light testified that he had attempted, with varying success, to contact the alibi witnesses whose names

had been given to him by Grogins. He testified, as well, that he had operated without substantial direction from Grogins and had free rein to follow leads as they developed. Udvardi testified that the fight and scooter chase had occurred "at or about presumably the time of the shooting . . . ." Specifically, he testified that, after his own investigation, he had been able to determine that calls were made to the New Haven Police Department at 7:10 p.m. and 7:23 p.m. regarding the fight, and that the dispatch time for the scooter chase was approximately 8 p.m. Udvardi indicated, as well, that his review of Grogins' trial file revealed no police reports or other records indicating an effort on Grogins' part to ascertain the timing of these events.

In assessing the petitioner's alibi witness claim, the habeas court concluded that the petitioner failed to meet his burden of proof both as to ineffectiveness and prejudice. The court concluded that Grogins' decision not to present an alibi defense was a matter of trial strategy and that her strategy was both well considered and reasonable. The court concluded, as well, that even if Grogins' trial strategy had been deficient, the petitioner failed to demonstrate that he was prejudiced by Grogins' decision not to present an alibi defense because the testimony of alibi witnesses would not, in fact, have exculpated the petitioner. The court reasoned that the timing of the murder and the locations where the petitioner was sighted within the time frame reflected in the record would have allowed the petitioner to commit the murder and return to his neighborhood in time to have been observed by the alibi witnesses that he presented.

On the basis of our careful review of the record, we find ample support for the habeas court's conclusion that the petitioner failed to prove that Grogins provided ineffective assistance in failing to pursue and to present an alibi defense. Our Supreme Court has acknowledged "that counsel need not track down each and every lead or personally investigate every evidentiary possibility before choosing a defense and developing it. . . . [T]he failure of defense counsel to call a potential defense witness does not constitute ineffective assistance unless there is some showing that the testimony would have been helpful in establishing the asserted defense. . . . [Particularly] [w]hen the failure to call a witness implicates an alibi defense, an alibi witness' testimony has been found unhelpful and defense counsel's actions have been found reasonable *when the proffered witnesses would fail to account sufficiently for a defendant's location during the time or period in question* . . . ." (Citations omitted; emphasis added; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 330 Conn. 520, 548–49, 198 A.3d 52 (2019).

In *Johnson*, our Supreme Court discussed whether trial counsel's failure to present an alibi witness in that

case constituted ineffective assistance. Although the underlying facts are, of course, not identical, the reasoning of the court in *Johnson* on this issue is instructive. The court indicated that "counsel testified to a variety of strategic reasons for [her] decision not to present an alibi defense," and that it was "required to indulge [in the] strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) Id., 550. The court noted the significance of trial counsel's reasoning for not presenting the alibi defense, particularly, the fact that "the alibi witnesses were family, the alibi placed the petitioner in close proximity to the crime scene, and the alibi witnesses testified that the petitioner was home but not within their line of sight." Id., 552. The court concluded that "counsel made a reasonable strategic decision because the proffered witnesses would [have] fail[ed] to account sufficiently for [the petitioner's] location during the time or period in question . . . ." (Internal quotation marks omitted.) Id., 554. The court concluded, as well, that "[e]ven if there [was] some showing that the [alibi] testimony would have been helpful in establishing the asserted [alibi] defense . . . defense counsel made a strategic decision that presenting an alibi defense had the potential to be more harmful than helpful to the petitioner's case." (Citation omitted; internal quotation marks omitted.) Id.

In the matter at hand, Grogins repeatedly testified at the habeas hearing that she believed that the third-party culpability defense was her strongest strategy at the petitioner's criminal trial and that she was concerned that presenting an alibi defense could do more harm than good. In addition, some of the purported alibi witnesses indicated that they had seen the petitioner in the vicinity of the fight, which was first reported to the police approximately fifteen minutes after the first report of the murder to the police, while some witnesses stated that they had observed the petitioner near the scene of a scooter chase, which took place shortly before 8 p.m. in the vicinity of the petitioner's house. Many of the witnesses conceded, as well, that they could not account for the petitioner's whereabouts throughout the entire time period during which these events occurred. Although the witnesses each placed the petitioner in the vicinity of his home, approximately one mile from the scene of the murder at various times during the early evening, their testimonies were inconsistent and varied as to the time they saw the petitioner and their descriptions of the petitioner's clothing and bicycle. Accordingly, we agree with the habeas court and conclude that Grogins' decision not to present an alibi defense was not constitutionally deficient.

B

The petitioner next claims that Grogins was ineffec-

tive for failing to properly investigate and to rebut the testimony of the eyewitnesses to the murder. This claim has two interwoven parts. First, the petitioner claims that Grogins unreasonably failed to investigate the reliability of statements given by Crimley and Caple. Second, the petitioner asserts that Grogins unreasonably failed to preserve the record regarding potential expert testimony on the subject of eyewitness identification.

The following additional information is pertinent to our discussion. As previously noted, on June 23, 2005, Crimley gave a statement to the police indicating that she had witnessed the shooter pass her on a bicycle and fire a gun at the victim; four days later, she identified the petitioner as the shooter after being presented with a photographic array. *State* v. *Outing*, supra, 298 Conn. 38–39. Caple, who was a former high school classmate of the petitioner and had known him for a few years, also identified the petitioner as the shooter from a photographic array after indicating that he had witnessed the shooter ride his bicycle on Canal Street and shoot the victim. Id. Prior to the start of the petitioner's criminal trial, both Crimley and Caple recanted their statements to the police and their identifications of the petitioner, alleging that they had been coerced into making the statements. Id., 39. Thereafter, at the hearing on the petitioner's motion to suppress the identifications, Crimley and Caple testified that they did not know who the shooter was and that the police had coerced them into making the statements. Id., 39–40. At the petitioner's criminal trial, Crimley and Caple testified, more adamantly than they had at the suppression hearing, that they were coerced into identifying the petitioner as the shooter.

During the habeas trial, Grogins indicated that when she was confronted with the initial statements from Crimley and Caple, she initially had intended to elicit Dysart's expert testimony concerning the fallibility of eyewitness identification. Grogins changed course, however, when she learned that Crimley and Caple had disavowed their statements and had, instead, alleged that their statements had been coerced by the police. From Grogins' perspective, the new assertions made by Crimley and Caple had changed her approach because she was no longer confronting an issue of mistaken identity but, rather, a claim of police coercion. Grogins also testified that presenting Dysart's testimony on mistaken identify would have been inconsistent with her trial strategy of undermining the identifications by demonstrating that police coercion had occurred. Accordingly, she decided not to present the testimony of Dysart at trial.

Grogins testified, as well, that she had directed her investigator, Light, to interview Crimley and Caple in an effort to develop their claim of police coercion, but Light had been unsuccessful in reaching them. Later in

her testimony, Grogins indicated that she did not recall whether she had instructed Light to make ongoing efforts to meet with Crimley and Caple after their suppression hearing testimony and prior to trial, but stated that she would not have any reason to dispute evidence indicating that such efforts had been made. Light also testified regarding his efforts to contact Crimley and Caple. He indicated that he had tried to contact Crimley and Caple, but those attempts had been unsuccessful. He indicated, as well, that Grogins had never provided him with specific instructions to meet with Crimley or Caple prior to the criminal trial.

In assessing Grogins' decision not to present Dysart's testimony and not to vigorously pursue Caple and Crimley before trial, the habeas court noted that, during the cross-examinations of Crimley and Caple at the criminal trial, Grogins concentrated on the issue of coercion and not whether their initial statements were borne of mistaken identifications of the petitioner. The court determined that Grogins had sufficiently articulated the tactical reasoning behind her method of investigation and examination of Crimley and Caple. The court also determined that Grogins had made the tactical decision not to produce an eyewitness identification expert at trial and that her decision not to pursue a theory of mistaken identity was reasonable under the circumstances.

The petitioner asserts that, even after Crimley and Caple had recanted their identifications of the petitioner at the suppression hearing, Grogins should have made efforts to contact them in the time period leading up to the criminal trial and, had she done so, she could have developed additional evidence regarding the reliability of their statements. The issue before us in this appeal, however, is not whether all reasonable lawyers would have made the same tactical decision as Grogins, but whether her decision to forgo additional investigation and rebuttal of the eyewitnesses' statements, which included forgoing expert testimony on the issue of misidentification, fell within the broad parameters of her decisional discretion. "Paramount to the effective assistance of counsel is the obligation by the attorney to investigate all surrounding circumstances of the case and to explore all avenues that may potentially lead to facts relevant to the defense of the case. . . . We are mindful that, under certain circumstances, the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel. . . . Nevertheless, the question of whether to call an expert witness always is a strategic decision. . . . [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; [but] strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."

(Citations omitted; emphasis omitted; internal quotation marks omitted.) *Arroyo* v. *Commissioner of Correction*, 172 Conn. App. 442, 467, 160 A.3d 425, cert. denied, 326 Conn. 921, 169 A.3d 235 (2017).

In the case at hand, we do not fault the habeas court's conclusion because we believe it accords appropriate deference to Grogins' tactical decision making in regard to forgoing additional investigation into Crimley's and Caple's statements and omitting Dysart's expert testimony on misidentification at trial. The record reflects that part of Grogins' third-party culpability theory at trial was to establish that the statements made by Crimley and Caple were the product of police coercion. Grogins' cross-examination of Crimley and Caple at the criminal trial advanced that theory by eliciting testimony that they were coerced. Although we acknowledge that additional investigation into Crimley's and Caple's statements may have shed more light on their credibility as witnesses, evidence in the record does not support a conclusion that Grogins' failure to do so was unreasonable. See *Moye* v. *Commissioner of Correction*, supra, 168 Conn. App. 218 ("To prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. . . . Competent representation is not to be equated with perfection." [Internal quotation marks omitted.]). In sum, we agree that Grogins' approach to the handling of these eyewitnesses fell within the wide range of reasonably effective assistance. In addition, the record is clear that Grogins' decision not to call Dysart as an expert at trial was based on her concern that doing so would have potentially detracted from the petitioner's coercion defense.[8] Thus, we also agree that Grogins' decision to forgo Dysart's expert testimony was a reasonable tactical choice under the circumstances and, accordingly, conclude that Grogins' performance was not deficient in this regard.

C

The petitioner next claims that Grogins was ineffective for failing to preserve for appellate review the trial court's exclusion of certain aspects of Dysart's expert testimony on eyewitness identification. Specifically, the petitioner claims that Grogins was ineffective for failing to obtain a ruling at trial as to the admissibility of five eyewitness identification factors about which the trial court had precluded Dysart from testifying at the hearing on the petitioner's motion to suppress.

The following additional information, as set forth by our Supreme Court in the petitioner's direct appeal, is relevant to our resolution of this claim. Prior to the start of the criminal trial, "[b]y way of a proffer, Dysart testified that . . . there is an undue risk of misidentification resulting from the identification procedure if, as occurred in the [underlying criminal] case: (1) the

photographs are shown to the witness simultaneously rather than sequentially; (2) after advising the eyewitness that the perpetrator may or may not be in the photographic array, the police provide the witness with a form that does not contain a line on which the witness may indicate that the array does not include the perpetrator; and (3) the police do not use a double-blind identification procedure, that is, one in which the person administering the procedure does not know the identity of the suspect. Dysart also explained that she intended to testify that (1) the perpetrator's use of a disguise can impair the ability of a witness to make an accurate identification (disguise effect); (2) under the principle of unconscious transference, a witness is more likely to identify a person as the perpetrator if that person looks familiar to the witness; (3) a witness tends to focus on the perpetrator's weapon instead of on the perpetrator, thereby reducing the likelihood of an accurate identification (weapons focus effect); (4) there is little or no correlation between the reliability of an identification and the witness' confidence in the identification; (5) a witness who is under stress while observing the commission of the crime is less likely to make an accurate identification of the perpetrator; and (6) witness collaboration can adversely affect the reliability of an identification. The state objected to Dysart's proffered testimony, claiming, inter alia, that it was inadmissible in light of this court's determination in *State* v. *Kemp*, 199 Conn. 473, 476–77, 507 A.2d 1387 (1986), and *State* v. *McClendon*, 248 Conn. 572, 586–87, 730 A.2d 1107 (1999), [both overruled in part by *State* v. *Guilbert*, 306 Conn. 218, 253, 49 A.3d 705 (2012)], that such testimony generally is within the common knowledge and experience of the average person and, therefore, it would not aid the fact finder in evaluating the identification evidence." (Footnote omitted; internal quotation marks omitted.) *State* v. *Outing*, supra, 298 Conn. 42–43.

"In reliance on *Kemp* and *McClendon*,[9] the trial court precluded Dysart from testifying that the reliability of the identification can be adversely affected by witness stress, witness collaboration, the perpetrator's use of a disguise and the perpetrator's use of a weapon, and that the witness' confidence in the accuracy of the identification bears little or no relation to the accuracy of the identification. In support of its ruling, the court explained that such testimony was unnecessary because it was within the realm of . . . common sense and . . . experience." (Footnote added; internal quotation marks omitted.) Id., 43 n.7. The court, however, "concluded that, out of an abundance of caution, Dysart could testify [at the suppression hearing] on the issues of the simultaneous presentation of photographs, police instructions to the witness, double-blind administration of the identification procedure and the theory of unconscious transference. The trial court emphasized that it

was limiting its ruling to the testimony at the hearing on the motion to suppress . . . and left the issue open should the [petitioner] seek to introduce Dysart's testimony at trial." (Internal quotation marks omitted.) Id., 43–44. After Dysart's testimony, the court denied the petitioner's motion to suppress. See id., 45–46.

In addition, "at trial, the [petitioner] made a motion requesting that Dysart be permitted to provide testimony concerning the four factors pertaining to the reliability of eyewitness [identification] procedures about which the trial court had allowed Dysart to testify at the suppression hearing. The trial court granted the [petitioner's] motion. With respect to the other five factors about which the trial court precluded Dysart's testimony at the suppression hearing, however, the [petitioner] never renewed his request that Dysart be permitted to testify at trial with respect to those factors. In fact, the [petitioner] did not call Dysart as a trial witness at all." Id., 63. The petitioner appealed, claiming, inter alia, that the trial court had improperly precluded him from introducing Dysart's testimony regarding the additional five factors. See id., 62–63. Our Supreme Court held that this issue was not preserved for appellate review. Id., 63.

For the same reason as stated in part I B of this opinion, we do not fault Grogins for failing to preserve, for appellate review, a claim concerning the trial court's order disallowing the proffer of Dysart's testimony concerning the additional five factors that reduce the reliability of eyewitness identification. Because Grogins already had reasonably determined not to present Dysart's testimony at the petitioner's criminal trial, she would have had no strategic reason to preserve the court's exclusion of evidence on a matter that she reasonably believed had been rendered moot by her tactical choice not to pursue a theory of mistaken identification. "[T]here is no requirement that counsel call an expert when [s]he has developed a different trial strategy." (Internal quotation marks omitted.) *Davis* v. *Commissioner of Correction*, 186 Conn. App. 366, 379, 199 A.3d 562 (2018), cert. denied, 330 Conn. 962, 199 A.3d 560 (2019).

Moreover, at the time of the underlying criminal trial, our decisional law did not permit expert testimony on the subjects for which Grogins initially sought to present expert testimony. Although *State* v. *Kemp*, supra, 199 Conn. 473, was overruled in part by *State* v. *Guilbert*, supra, 306 Conn. 253,[10] recent decisions of this court that have addressed claims of ineffective assistance of trial counsel arising from counsel's decisions on the issue of expert testimony on eyewitness identification in between our Supreme Court's opinions in *Kemp* and *Guilbert* have held that counsel's decision not to present the testimony of an eyewitness identification expert did not constitute deficient performance. See,

e.g., *Davis* v. *Commissioner of Correction*, supra, 186 Conn. App. 378 ("[a]lthough *Kemp* was overruled . . . we consider [counsel's] performance in light of the standards in effect at the time of the petitioner's criminal trial . . . and conclude that the habeas court did not err in concluding that [counsel's] performance was not deficient"); *Bennett* v. *Commissioner of Correction*, 182 Conn. App. 541, 562, 190 A.3d 877 ("because the law in effect at the time of the criminal trial discouraged the use of expert testimony on the issue of eyewitness identification, [counsel] did not perform deficiently by not presenting expert testimony"), cert. denied, 330 Conn. 910, 193 A.3d 50 (2018). To impose on counsel the duty to foretell what tack our Supreme Court would take on this subject represents the height of post hoc reasoning, which is not the task of a court on habeas review. See *Ledbetter* v. *Commissioner of Correction*, 275 Conn. 451, 462, 880 A.2d 160 (2005) (Counsel is not "required to change then-existing law to provide effective representation. . . . Counsel instead performs effectively when he elects to maneuver within the existing law . . . ." [Citation omitted; internal quotation marks omitted.]), cert. denied, 546 U.S. 1187, 126 S. Ct. 1368, 164 L. Ed. 2d 77 (2006). Accordingly, we agree with the habeas court and conclude that Grogins did not perform deficiently by not preserving for appellate review a claim related to the trial court's exclusion of Dysart's expert testimony regarding the additional five factors concerning eyewitness identifications.

## II

The petitioner next claims that his appellate counsel was ineffective for failing to claim, in his direct appeal, that the trial court incorrectly denied the petitioner's request to present surrebuttal evidence at trial.[11] We note briefly our standard of review of a claim of ineffectiveness of appellate counsel. "A criminal defendant's right to the effective assistance of counsel extends through the first appeal of right and is guaranteed by the sixth and fourteenth amendments to the United States constitution and by article first, § 8, of the Connecticut constitution. . . . To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in [*Strickland* v. *Washington*, supra, 466 U.S. 687] . . . . Our Supreme Court has, however, distinguished the standards of review for claims of ineffective assistance of trial counsel and of appellate counsel. . . . For claims of ineffective assistance of appellate counsel, we must assess whether there is a reasonable probability that, but for appellate counsel's failure to raise the issue on appeal, the petitioner would have prevailed [on] appeal, i.e., [obtaining] reversal of his conviction or granting of a new trial." (Citation omitted; internal quotation marks omitted.) *Smith* v. *Commissioner of Correction*, 148 Conn. App. 517, 530, 85 A.3d 1199, cert. denied, 312 Conn. 901, 91 A.3d 908 (2014).

Additionally, "[j]ust as with a claim of ineffective assistance of trial counsel, success on a claim of ineffective assistance of appellate counsel requires the petitioner to establish that appellate counsel's representation fell below an objective standard of reasonableness considering all of the circumstances. . . . [Although] an appellate advocate must provide effective assistance, [*she*] *is not under an obligation to raise every conceivable issue.* A brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions. . . . Indeed, [e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. . . . Moreover, [a] habeas court will not, with the benefit of hindsight, second-guess the tactical decisions of appellate counsel." (Emphasis added; internal quotation marks omitted.) Id., 531.

The following additional information is relevant to this claim. As previously noted, Grogins pursued a claim of third-party culpability at the petitioner's criminal trial. In furtherance of this claim, Shaniah Outlaw testified on behalf of the petitioner that she had overheard Darrell Mayes confess to the shooting. Once the petitioner's defense rested, the state called Vasquez as a rebuttal witness. Vasquez testified that when he had interviewed Outlaw, she denied ever telling anyone that she had overheard Mayes confess. In light of this testimony, Grogins sought to introduce surrebuttal testimony from Allison Carter, Outlaw's mother. By way of a proffer, Grogins indicated that Carter would testify that she was present when her daughter told Vasquez of the purported confession by Mayes. See *State* v. *Outing*, supra, 298 Conn. 71. The court denied the request to present Carter's surrebuttal testimony, and, on appeal, the petitioner's appellate counsel, Attorney James B. Streeto, did not claim that the trial court had abused its discretion in denying the petitioner's request for Carter's surrebuttal evidence. See id.

Streeto testified at the habeas trial that, given page limitations for briefing, he did not have the space to include an argument on this issue and that he had determined not to present such an argument because, in his view, it was one of the petitioner's weaker arguments. Streeto also testified that the level of deference afforded a trial court's decision not to allow surrebuttal evidence had impacted his assessment of whether to raise it as an issue on appeal. He believed, as well, that the inclusion of this relatively weak argument could have detracted from his presentation on the arguments he briefed.

The habeas court concluded, and we agree, that Streeto made a reasonable strategic decision not to raise the surrebuttal issue on appeal, and that his deci-

sion fell within the wide range of reasonable professional assistance. Our case law is clear that a court will not second-guess an appellate counsel's tactical decision to limit the claims briefed to those claims that he or she reasonably viewed as most critical to the appeal. See, e.g., *Smith* v. *Commissioner of Correction*, supra, 148 Conn. App. 532 (petitioner failed to prove appellate counsel's performance fell below objective standard of reasonableness where counsel had "reviewed the pleadings and transcripts, identified the possible issues and then strategically determined which issues had the best chance of winning" [internal quotation marks omitted]); *Saucier* v. *Commissioner of Correction*, 139 Conn. App. 644, 652, 57 A.3d 399 (2012) (appellate counsel's performance not deficient where counsel had "made his tactical decision to focus on the strongest of the petitioner's claims on appeal . . . after considering the relevant case law and whether the claim was properly preserved, and after consulting with other experienced counsel"), cert. denied, 308 Conn. 907, 61 A.3d 530 (2013). Accordingly, we conclude that the court properly determined that the petitioner failed to prove that Streeto's performance was deficient.

## III

Finally, the petitioner claims that the habeas court incorrectly determined that he did not prove his claim of actual innocence. "[T]he proper standard for evaluating a freestanding claim of actual innocence, like that of the petitioner, is twofold. First, the petitioner must establish by clear and convincing evidence that, taking into account all of the evidence—both the evidence adduced at the original criminal trial and the evidence adduced at the habeas corpus trial—he is actually innocent of the crime of which he stands convicted. Second, the petitioner must also establish that, after considering all of that evidence and the inferences drawn therefrom as the habeas court did, no reasonable fact finder would find the petitioner guilty of the crime." *Miller* v. *Commissioner of Correction*, 242 Conn. 745, 747, 700 A.2d 1108 (1997).

"Actual innocence is not demonstrated merely by showing that there was insufficient evidence to prove guilt beyond a reasonable doubt. . . . Rather, actual innocence is demonstrated by affirmative proof that the petitioner did not commit the crime. . . . Affirmative proof of actual innocence is that which might tend to establish that the petitioner could not have committed the crime even though it is unknown who committed the crime, that a third party committed the crime or that no crime actually occurred." (Internal quotation marks omitted.) *Carmon* v. *Commissioner of Correction*, 178 Conn. App. 356, 371, 175 A.3d 60 (2017), cert. denied, 328 Conn. 913, 180 A.3d 961 (2018).

This court has stated that "[a] claim of actual innocence must be based on newly discovered evidence.

. . . This evidentiary burden is satisfied if a petitioner can demonstrate, by a preponderance of the evidence, that the proffered evidence could not have been discovered prior to the petitioner's criminal trial by the exercise of due diligence." (Internal quotation marks omitted.) *Ampero* v. *Commissioner of Correction*, 171 Conn. App. 670, 687, 157 A.3d 1192, cert. denied, 327 Conn. 953, 171 A.3d 453 (2017).

In support of his claim of actual innocence, the petitioner relies on third-party culpability evidence presented at the habeas trial, which he claims points either to Antwan Baldwin or Mayes as the shooter. In particular, the petitioner relies on the fact that Baldwin's fingerprints were found on a bicycle left at the murder scene, which Baldwin acknowledged he owned but claimed had been stolen from him. The petitioner relies, as well, on the negative inferences that he contends may be drawn from Mayes' invocation at the habeas trial of his fifth amendment privilege against self-incrimination. Additionally, the petitioner relies on testimony from his alibi witnesses that they saw him at the fight and on testimony from Crimley that the petitioner was not the shooter.

Given the well established parameters of decisional law on the topic of actual innocence, this claim warrants little discussion. The habeas court's conclusion is apt: "Even assuming arguendo that the evidence in support of an actual innocence claim was not required to be newly discovered, the court finds that the mosaic of evidence presented by the petitioner does not constitute affirmative proof of actual innocence, as it does not tend to establish that the petitioner could not have committed the crime as it relates to the other evidence in the case." (Internal quotation marks omitted.) The court's apt rejection of this claim needs no embellishment.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The habeas court took judicial notice of the decision in *State* v. *Outing*, supra, 298 Conn. 34, during the habeas trial.

[2] In particular, the petitioner raised twenty-nine ineffective assistance of counsel claims in regard to his trial counsel, including that counsel was ineffective for failing to properly investigate and present an alibi defense, failing to properly investigate and rebut the state's eyewitnesses, and failing to preserve the record concerning the trial testimony of an expert witness on witness identifications. The petitioner also claimed that his due process rights were violated by the trial court's denial of his request to present surrebuttal evidence; his appellate counsel provided ineffective assistance by failing to raise a claim on appeal challenging the trial court's denial of his request to present surrebuttal evidence; he was actually innocent; and the cumulative impact of both his trial and appellate counsels' errors deprived him of his right to the effective assistance of counsel and due process.

[3] The parties filed several motions for extensions of time to file their posttrial briefs. On July 21, 2017, after receiving the parties' posttrial briefs, the habeas court reserved the decision on its ruling.

[4] The only ineffective assistance of trial counsel claims that the petitioner raises in his brief on appeal are that his trial counsel failed (1) to properly investigate and to present an alibi defense, (2) to investigate and to rebut

the testimony of the state's eyewitnesses, and (3) to preserve the record concerning the trial testimony of his expert witness on witness identifications. Thus, the petitioner's other ineffective assistance of trial counsel claims raised in his amended petition are deemed abandoned. See *Merle S.* v. *Commissioner of Correction*, 167 Conn. App. 585, 588 n.4, 143 A.3d 1183 (2016) (claims of ineffective assistance of trial counsel not pursued on appeal are deemed abandoned).

[5] Attorney Grogins has since become a judge of the Superior Court. With no disrespect intended to Judge Grogins, we follow our normal practice in this opinion of referring to witnesses by their last names after initially identifying them by their full names.

[6] The record reflects that Moe's Market is located at the intersection of Dixwell Avenue and Harding Place, about a three minute bicycle ride south of the petitioner's residence and, therefore, between his residence and Canal Street, the scene of the shooting.

[7] "Dickey" shirt may refer to the "Dickies" brand of apparel. In the habeas trial transcripts, the term is spelled as "dickey" or "Dickey." For consistency, we maintain the spelling as "dickey."

[8] Our Supreme Court reached the same conclusion in the petitioner's direct appeal, albeit in the context of the petitioner's claim that the trial court had improperly barred him from presenting portions of Dysart's testimony at his criminal trial. See *State* v. *Outing*, supra, 298 Conn. 64 ("[m]oreover, it is reasonable to conclude that the [petitioner's] decision not to call Dysart as a trial witness was a tactical one predicated on the concern that to do so might detract from the [petitioner's] claim that Crimley and Caple had not made a good faith but mistaken identification of the [petitioner] as the shooter but, rather, had been coerced by the police into identifying the [petitioner]").

[9] In *State* v. *Kemp*, supra, 199 Conn. 477, and *State* v. *McClendon*, supra, 248 Conn. 586, our Supreme Court affirmed the trial court's exclusion of expert testimony on eyewitness identification after observing that such testimony had previously "been excluded on the grounds that the reliability of eyewitness identification is within the knowledge of the jurors and expert testimony generally would not assist them in determining the question."

[10] After the petitioner's criminal trial and direct appeal, our Supreme Court decided *State* v. *Guilbert*, supra, 306 Conn. 218, in which it expressly overruled *Kemp* and *State* v. *McClendon*, supra, 248 Conn. 572, and held that "the reliability of eyewitness identifications frequently is not a matter within the knowledge of an average juror"; *State* v. *Guilbert*, supra, 251; and "expert testimony is an effective way to educate jurors about the risks of misidentification." Id., 252.

[11] "Surrebuttal evidence is that which is offered to meet evidence raised in rebuttal. [O]nly evidence to explain away new facts brought forward by the proponent in rebuttal . . . is properly admissible [in surrebuttal]. . . . [Our Supreme Court previously has] stated that there is no constitutional right to present surrebuttal evidence. . . . The presentation of surrebuttal evidence is a matter resting squarely within the discretion of the trial court. . . . The defendant must demonstrate some compelling circumstance and the proffered evidence must be of such importance that its omission puts in doubt the achievement of a just result." (Internal quotation marks omitted.) *State* v. *Goriss*, 108 Conn. App. 264, 272, 947 A.2d 1041, cert. denied, 289 Conn. 904, 957 A.2d 873 (2008).